753 So.2d 801 (1999)
STATE of Louisiana
v.
Henri BROADWAY.
No. 96-KA-2659.
Supreme Court of Louisiana.
October 19, 1999.
*805 Frederick Kroenke, Jr., Robert Earl Randolph, Baton Rouge, Danalynn Recer, Clive Adrian Stafford Smith, New Orleans, Counsel for Applicant.
Richard P. Ieyoub, Atty. Gen., Douglas P. Moreau, District Atty., Premila Burns, Monisa L. Thompson, Baton Rouge, Counsel for Respondent.
LEMMON, Justice.[*]
This is a direct appeal from a conviction of first degree murder and a sentence of death. La. Const. art. V, § 5(D). The principal issues involve (1) hearsay evidence given by police officers regarding statements, made by persons who did not testify at trial, that implicated defendant as a participant in the robbery and murder; (2) the surviving victim's identification of defendant after being subjected to hypnosis; (3) the admission of allegedly perjured testimony; and (4) the voluntariness and validity of defendant's allegedly coerced confession.[1]

Facts
During the evening of January 7, 1993, Kimien Lee left the supermarket where she was store manager and rode in a police vehicle with Corporal Betty Smothers, an off-duty police officer on special detail at the supermarket, to deposit the store's sales receipts into the bank deposit box. Officer Smothers drove the vehicle into the bank's parking lot next to the box. While Lee was in the process of opening the box to make the deposit, a series of gunshots erupted. Lee turned and saw that Officer Smothers had been shot and realized that she also had been shot. She reached across Officer Smothers, pulled herself toward the steering wheel, and pressed the gas pedal. At that point, one of the assailants looked in the driver's side window, and Lee made eye contact with him. She then sped out of the parking lot and drove the car to a nearby convenience store, where she called the police.
Officer Smothers died almost immediately, but Lee survived the attack. The next day, Lee underwent hypnosis in the hospital to aid the police in preparing a composite drawing of the assailant that she had observed at close range.
On January 9, 1993, Detective Denicola received a tip from a confidential informant that Kevan Brumfield had murdered the police officer and that Eddie Paul had information about the crime. Brought to the police station as a material witness, Eddie Paul told the police that his cousin West Paul, along with Kevan Brumfield and someone he knew only as A.J. or Ray J., had committed the crime.
The police obtained warrants for Brumfield and West Paul, who were both arrested on January 11, 1993. After searching the police records for someone with the street name of A.J. or Ray J., the police identified Deron Brooks as a possible suspect. Eddie Paul viewed a photograph of Brooks and positively identified him as the man he knew as Ray J. and who had accompanied Brumfield and West Paul. The police obtained a warrant for Brooks and arrested him, but quickly released him upon learning that he had been in police custody at the time of the shooting.
West Paul, upon questioning by the police, implicated defendant in the crime. When the police arrested defendant at his home, he spontaneously stated, "I knew you were coming," and "I didn't shoot the police officer." On the way to the police station, defendant also spontaneously stated that he had nothing to do with the killing of the police officer and nothing to do with Brumfield, although the police did *806 not mention either the murder or Brumfield.
The police also searched defendant's home based on his mother's giving consent to search, and they seized a camouflage jacket similar to the one worn by the assailant seen by Lee.
According to the police, defendant initially denied any involvement in the crime, but admitted after being shown pictures of Officer Smothers that he had been involved. He stated that Brumfield and "Smokey" picked him up to rob two women who were going to make a bank deposit, but claimed he did not know one of the women was a police officer. He further stated that they waited in the bushes until the women arrived, and he then ran toward the car and fired six or seven rounds with his pistol. Upon being requested to give a taped statement, defendant refused and claimed that he hadn't said anything, adding that he would deny anything they had written in their notes. Nevertheless, according to the police, the detective read the notes to defendant who initialed the statement.
At trial, Lee positively identified defendant as one of the assailants, and West Paul, while admitting he was the driver of the getaway car, confirmed that defendant participated in the robbery and murder. The defense called a series of family members and friends who testified that defendant was at home in their company at the time of the murder.
Defendant also took the stand and denied any involvement in the crime. He specifically denied that he made any inculpatory statements to the police and claimed that he was beaten by the police during his interrogation. He gave a detailed account of that attack which included blows struck by the fists of the officers and partial asphyxiation underneath a plastic bag pulled over his head. When defendant put on, in front of the jury, the camouflage jacket seized from his bedroom, the oversized jacket came down over his wrists in the manner described by Lee after her hypnotic session.
The jury unanimously found defendant guilty of first degree murder. After trial of the penalty phase, the jury unanimously recommended the death penalty, finding as aggravating circumstances that defendant had been engaged in the perpetration of an attempted armed robbery, that the victim was a peace officer engaged in her lawful duties, and that defendant knowingly created the risk of death or great bodily harm to more than one person. Defendant then filed this appeal.

Hearsay Evidence that Identifies the Accused
Defendant first contends that the prosecutor presented hearsay testimony from two police officers that Kevan Brumfield implicated defendant as one of the principals in the murder, thereby placing before the jury statements by Brumfield that were not made under oath or subject to cross-examination. Defendant argues that the prosecutor further heightened the prejudice by emphasizing in closing argument during the guilt phase that defendant was guilty because Brumfield had identified him as one of the perpetrators.
During the direct testimony of Detective Bates, the prosecutor questioned him about his interrogation of Kevan Brumfield, asking:
Q: I'm going to ask you to tell the jury the first time that you ever heard the name, Henri Broadway?
Defense Attorney: Your Honor, that calls for hearsay.
District Attorney: Your Honor, at this time, under State versus Edwards, we are asking that this matter be offered forto show the sequence of events in this case, not for the truth of any assertion, but the focus of how they focused on Mr. Broadway without any contacts, any involvement that may have been alleged by this co-defendant, Mr. Brumfield.

*807 Defense Attorney: Pursuant to that case, your Honor,date and time and circumstancescalls for hearsay.
The Court: I think the question was, when did you hear it?
Defense Attorney: Yes, Your Honor.
District Attorney: Under what circumstances?
Defense Attorney: Under what circumstances, Your Honor.
The Court: That's not asking for hearsay. Overruled.
Q: Under what circumstances did you first hear the name of Henri Broadway?
A: During the course of the interview with Mr. Brumfield.

Q: And prior to Mr. Brumfield giving you that information did you have any idea of what the actual name of Ray J. was?

A: No, ma`am, I did not.

Q: And during this interview did you hear both the names, Ray J. and Henri Broadway as being Mr. Broadway?

A: Yes, ma`am, (emphasis added).
The prosecutor also elicited similar testimony from Detective Callahan, asking Callahan, "I'm going to ask you to tell the circumstances under which you first heard the name of Henri Broadway?" The defense objected, but the objection was overruled, and Callahan answered, "In questioning Kevan Brumfield."
Despite her representations, in arguing against defense counsel's hearsay objection, that the information Detective Bates received from Brumfield was offered "not for the truth of any assertion," the prosecutor used those statements for the truth of their contents by emphasizing in closing argument in the guilt phase that Brumfield (who has earlier been sentenced to death for his part in the murder) identified defendant as a co-perpetrator. The prosecutor argued:
"They picked up and questioned this Deron Brooks.... Brumfield looks at him and they let the guy go. And Brumfield goes, that's not Ray Jay. And he gave them the name of Henri Broadway. And once again, if this isn't the right man, this is the carmel complected black male, camouflage jacket, fitting in that fashion, was given up by Mr. Brumfield." (emphasis added.)[2]
This court addressed the problem of hearsay evidence that identifies the accused as the perpetrator of the crime in State v. Wille, 559 So.2d 1321, 1329-32 (La.1990), stating:
Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, when the statement is being offered as an assertion to show the truth of matters asserted therein and thus rests for its value upon the credibility of the out-of-court asserter. State v. Martin, 356 So.2d 1370 (La.1978); La.C.Evid. Art. 801(C). One of the primary justifications for the exclusion of hearsay is that the adversary has no opportunity to cross-examine the absent declarant to test the accuracy and completeness of the testimony. The declarant is also not under oath at the time of the statement. Moreover, the confrontation clause of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him". U.S. Const. amend. VI. There is no opportunity for confrontation when an assertion by one *808 party is presented through the testimony of another party.

The relationship between the confrontation clause and hearsay evidence was discussed in California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). The Court recognized that the reasons for excluding hearsay assertions were (1) to insure that the witness will make his assertions under oath, thus impressing him with the seriousness of the matter and subjecting untrue statements to a penalty for perjury; (2) to force the witness to submit to cross-examination, characterized as the "greatest legal engine ever invented for the discovery of truth"; (3) to permit the jury which decides the defendant's fate to observe the demeanor of the witness in making his statements, thus aiding the jury in assessing the witness' credibility. Id. At 158, 90 S.Ct. at 1935.

Many decisions have additionally recognized the inherent unreliability of hearsay statements by accomplices who do not appear at trial....
. . .
In the present case the prosecutor, citing State v. Calloway, 324 So.2d 801 (La.1976), State v. Monk, 315 So.2d 727 (La.1975), and State v. Smith, 400 So.2d 587 (La.1980[1981]), argues that testimony by a police officer, as to his action taken in response to a person's out-of-court statement, is admissible, not to prove the truth of the out-of-court statement, but to explain the sequence of events leading to the arrest of the defendant from the viewpoint of the investigating officer. However, those cases are distinguishable from the present case. The substance of Officer Harvey's testimony in the present case was that two eyewitnesses named defendant as the perpetrator of the crime, while the substance of the out-of-court assertions in the cited cases did not significantly connect the defendant with the crime.
Admission of information received by a police officer in the investigation of a crime, on the basis that such information explains the officer's presence and conduct and therefore does not constitute hearsay evidence, is an area of widespread abuse. McCormick on Evidence § 249 (E. Cleary 3d ed.1984). Such information frequently has an impermissible hearsay aspect as well as a permissible nonhearsay aspect, and the court in determining admissibility should balance the need of the evidence for the proper purpose against the danger of improper use of the evidence by the jury. Id. The fact that an officer acted on information received in an out-of-court assertion may be relevant to explain his conduct, but this fact should not become a passkey to bring before the jury the substance of the out-of-court information that would otherwise be barred by the hearsay rule. G. Pugh, Louisiana Evidence Law 429-431 (1974).
When an out-of-court statement, such as information received by a police officer during an investigation of a crime, has both an impermissible hearsay aspect and a permissible nonhearsay aspect, the issue of relevancy becomes significantly interrelated with the hearsay issue. If the nonhearsay content of the statement has little or no relevance, then the statement should generally be excluded on both relevance and hearsay grounds. Marginally relevant nonhearsay evidence should not be used as a vehicle to permit the introduction of highly relevant and highly prejudicial hearsay evidence which consists of the substance of an out-of-court assertion that was not made under oath and is not subject to cross-examination at trial.
There was no true issue in the present case as to the propriety of any action taken by Agent Harvey during his investigation of the Lopatta murder. Indeed, an investigating officer's testimony at trial (as opposed to testimony at a motion to suppress), explaining his conduct *809 after an investigation, almost always has only marginal relevance at best. The real purpose of Harvey's testimony in the present case about the information received from Judith and Sheila Walters was to place before the jury the fact that their statements had named defendant as the killer of Nichole Lopatta. The value of the statements rested upon the credibility of the out-of-court assertions. Because Judith and Sheila Walters did not testify, evidence of the fact that their statements named defendant as the killer was otherwise barred by the hearsay rule. Clearly, the extremely marginal relevance of Agent Harvey's testimony for the purpose of explaining his conduct in the investigation was greatly outweighed by the danger that the jury would use this testimony as substantive evidence that Judith and Sheila Walters had named defendant as the killer. The only truly relevant information conveyed by Agent Harvey to the jury was his conclusion, after interviewing two eyewitnesses to the crime for which defendant was on trial, that defendant was the perpetrator and that the eyewitnesses' version of the events was completely corroborated by physical and other evidence uncovered by the investigation. Because the assertions related by Judith and Sheila Walters to Agent Harvey, the substance of which was conveyed to the jury, were presented almost solely for their relevance and assertive value in establishing defendant's guilt and were not given under oath or ever subjected to cross-examination, and because such assertions by accomplices are inherently suspect, the testimony should have been excluded as hearsay and irrelevant evidence. (emphasis added, footnotes omitted.)
Information about the course of a police investigation is not relevant to any essential elements of the charged crime, but such information may be useful to the prosecutor in "drawing the full picture" for the jury. However, the fact that an officer acted on information obtained during the investigation may not be used as an indirect method of bringing before the jury the substance of the out-of-court assertions of the defendant's guilt that would otherwise be barred by the hearsay rule. State v. Wille, 559 So.2d 1321, 1331 (La.1990); State v. Hearold, 603 So.2d 731, 737 (La. 1992). As this Court emphasized in Hearold, 603 So.2d at 737,
Absent some unique circumstances in which the explanation of purpose is probative evidence of a contested fact, such hearsay evidence should not be admitted under an "explanation" exception. The probative value of the mere fact that an out-of-court declaration was made is generally outweighed greatly by the likelihood that the jury will consider the statement for the truth of the matter asserted.
The prosecutor has some latitude to present a full picture because the jury may "penalize the party who disappoints them by drawing a negative inference against that party." Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 654, 136 L.Ed.2d 574 (1997). Reasonable jurors may expect to learn that the police did not arrest the defendant out of thin air, but as the result of a thorough professional investigation. However, the prosecutor in the present case could simply have shown that West Paul, who did testify at trial under oath and subject to cross-examination, implicated defendant as a co-perpetrator, without any reference to the statements by Brumfield, which were not under oath and not subject to cross-examination.
The prosecutor seriously crossed over the line drawn by the decisions in Wille and Hearold when she deliberately elicited testimony that Brumfield, a participant in the shooting, had designated defendant by name as the unidentified (or misidentified) Ray J. Although the verbatim content of Brumfield's statement was not placed before jurors, the assertive content of that statement was introduced (and was later emphasized in closing argument). Under *810 these circumstances, the decisions in Wille and Hearold make clear that the state may not do indirectly, under the guise of asking the police to describe the course of their investigation, what it cannot do directly: place before the jury the presumptively unreliable statement of a non-testifying participant implicating defendant in the crime. See Lee v. Illinois, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986); Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).
Having concluded that the prosecutor's presentation of hearsay evidence of Brumfield's statement implicating defendant in the crime was significant error, we must now determine whether the error was harmless beyond a reasonable doubt. To do so, we first discuss the other evidence upon which the conviction was based and defendant's arguments relating to that evidence.

Hypnosis-Refreshed Testimony of the Surviving Victim
One of the most damaging items of the prosecutor's evidence was the identification of defendant by the surviving victim, Kimien Lee. Defendant argues that the identification, which was made after Lee had been hypnotized, should not have been admitted, and that the error was compounded by the fact that the court denied his pretrial motion to discover the tape of the hypnosis.
On the day of the shooting and while Lee was in the hospital, she provided the following description of the attacker:
About five eight, five nine, one hundred and seventy pounds, early thirties, light caramel colored skin, eye glasses, wearing a dark colored baseball style cap, and a green or camouflaged type hunting jacket pulled up to his neck. He was armed with a silver colored automatic pistol with a black handle. He was right-handed. After the shooting stopped he leaned over and looked into the driver side of the vehicle. She said he was close enough for her to get a good look at him. He may have been next to the vehicle. His complexion appeared smooth to her.
The next day, Lee was hypnotized in the hospital by a police officer trained in the procedure. In the first description Lee gave under hypnosis, she stated:
Silver gun down by his side, possible black leather gloves, facial features are not of a pure black person but a person of mixed race, caramel complexion, clear gloves, baseball cap pulled down, bulky camouflage jacket that covered him.
Upon being questioned during hypnosis, she provided the following description:
Camouflage or a black baseball cap, sleeves of a jacket extended past wrists, possible gloves, jacket pulled up around him, build not of a big man, slim nose, not strong black features. I want to see curly hair, and I want to see gray. Gray is a color that it keeps sticking in with me on his body. His eyes may be pointed, just a little like cat eyes, automatic dull gray gun, not as big as a .45, a gray color, I see black. It may have been the grip of his gloves
Two days after the hypnosis, Lee provided a further description:
Cap, glasses, smooth caramel complexion, shiny, possibly from the rain, automatic weapon, silver or dull gray. I remember seeing black, maybe a black handle, black cap, pulled down tight, glovesexcuse me. Gloves, sleeves extending past his writs [sic], slim man, kind of drawn in cheeks, mid thirties. It wasn't a young kid, but it's hard to distinguish ages with black people. Hair, it might have been a salt and pepper. Big clear plastic glass frames, not a real strong nose, cat eyes. She described him as about mid thirties, slim, colored complexion, shiny skin, maybe from the rain, wearing clear, plastic, big frame glasses, and possibly a black colored baseball styled cap pulled down tight. He was also wearing some type of leather gloves that were either driver or insulated gloves with the fingers *811 enclosed. The sleeves of his jacket extended past his writs [sic]. She saw a silvered color automatic pistol in his hand below the waist at hip level. His hair appeared to be salt and pepper, possibly. Their eyes connected and she said that it appeared to her as if he had looked in to see what he had done, or see if they were finished. She said that he appeared cautious in the way he approached and eased his upper body to look into the car....
At trial, Lee provided a fairly detailed description, as follows:
A: He had a camouflage jacket on, came down below his wrists.
Q: The sleeves?
A: Correct. Possibly, maybe like a size larger. I remember seeing black leather gloves. I remember a gun, an automatic, the dull gray, a black handle. I remember a dark baseball cap, not your traditional kind that fit tight to your head, but like a fisherman's cap, or something like that, just dark, pulled down. I remember the glasses were clearish gray, no tinting on the glass, like shooters' glasses.
Q: Complexion? What was his complexion?
A: It was a caramel complexion. It was shiny. There was something here that always confused me, but I didn't because his jacket was pulled up tight and there was something here that always confused me, but I couldn't tell. And when he looked at me, his eyes were big, very, very big. And they were brown. And that's what I can't get out of my mind.
In State v. Wren, 425 So.2d 756, 759 (La.1983), this court explained that the testimony of a witness who had his or her memory refreshed through hypnosis should be treated as other "recollection refreshed" testimony, because the hypnosis affects the credibility, and not the admissibility, of the evidence. In Wren, the witness provided detailed descriptions of the perpetrators and identified them from a photographic lineup before being subjected to hypnosis. Significantly, the hypnosis did not produce any facts which had not been previously elicited from the witness.
In State v. Goutro, 444 So.2d 615 (La. 1984), the witness provided a detailed recollection of events and identified the perpetrator (who lived with her) before being hypnotized. She did not produce any additional facts while under hypnosis, but was able to clarify dates and times of events. This court, emphasizing that the case did not involve the issue of hypnotically-induced testimony, ruled that the court properly allowed the witness to testify.
In the present case, Lee provided a description of the attacker to the police before she was hypnotized, and the descriptions she provided during and after hypnosis were essentially similar.[3]
Therefore, as in Wren and Goutro, this case does not involve significant prejudicial evidence that was induced by the hypnosis. Indeed, the police had not yet identified defendant as a suspect at the time Lee was hypnotized and when she provided the January 10, 1993 description. Until Brumfield implicated defendant on January 11, 1993, the police believed Brooks was the other perpetrator. Consequently, the police could not have made suggestions about defendant while Lee was hypnotized. We therefore conclude Lee's identification evidence was properly admitted at trial, despite the hypnosis.
As to the trial court's denial of the motion to produce the videotape of the *812 hypnosis session, this court has previously commented on the recording of hypnotic sessions as one of the precautions law enforcement officers and prosecutors should take when utilizing hypnosis, stating that:
[L]aw enforcement officers and prosecutors should, at the least, be prepared to demonstrate the content and degree of the witness' recall before hypnosis. Obviously, a written or otherwise recorded statement (in as great detail as possible) should be taken. Second, the hypnotic session itself should be recorded so that there is no question as to the events recalled or the manner in which the hypnotic session was conducted. Third, the hypnosis should be conducted by a qualified (and preferably independent) hypnotist.
Goutro, 444 So.2d at 618 (Lemmon, J., concurring, emphasis in original).
In the present case, the hypnotic session was recorded, but the trial court denied the motion by the defense to produce the tape. This ruling precluded the defense from thoroughly cross-examining the victim about her description and the hypnotist (a police officer) about the method he employed. However, there was no prejudice by the ruling because Lee's description varied only slightly after hypnosis and because the police could not have prompted Lee to describe defendant, who was not yet identified as a suspect.
The most troubling aspect of Lee's identification of defendant was the substantial delay between the crime and the photographic line-up in which she identified defendant. Despite the fact that defendant was taken into custody several days after the murder, Lee was not asked to participate in a photographic line-up until more than one year later.
The defendant has the burden of proof on a motion to suppress an out-of-court identification. La.Code Crim. Proc. art. 703D. To suppress an identification, the defendant must first prove that the identification procedure was suggestive. State v. Prudholm, 446 So.2d 729 (La. 1984). An identification procedure is suggestive if, during the procedure, the witness' attention is unduly focused on the defendant. State v. Robinson, 386 So.2d 1374, 1377 (La.1980). However, even when suggestiveness of the identification process is proved by the defendant or presumed by the court, the defendant must also show that there was a substantial likelihood of misidentification as a result of the identification procedure. State v. Prudholm, supra.
In Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Court held that an identification may be permissible, despite the existence of a suggestive pretrial identification, if there does not exist a "very substantial likelihood of irreparable misidentification." The factors which courts must examine to determine, from the totality of the circumstances, whether the suggestiveness presents a substantial likelihood of misidentification include (1) the witness' opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. Id. at 114, 97 S.Ct. 2243.
As to the one-year delay before the pretrial identification, during which time defendant's picture appeared in the newspaper and on television, Lee testified that although she saw one picture of the defendant in the newspaper, she "chose not to look at the person. I see the person in my mind every day." Lee further testified that the officers at the line-up only told her that they wanted her to look at some pictures and see if she recognized anyone, and they told her to take her time. After scanning each of the six photographs, she immediately selected defendant.
Therefore, the identification procedure does not appear suggestive. Moreover, *813 Lee was able to describe defendant in detail to the police immediately after the crime, and her identification was based on her clear view of the assailant while her attention was focused upon him as he looked into the car. She was certain of her identification at the photographic lineup and in court. Accordingly, there was little likelihood of misidentification, and the trial court did not err in permitting Lee's identification evidence at trial.

Allegedly Perjured Testimony of West Paul
The second major item of the prosecutor's evidence was the testimony of West Paul, who conceded at trial that he was the driver of the getaway car, but implicated defendant as one of the two attackers who perpetrated the attempted robbery and murder.
Defendant attacks the testimony of West Paul on several bases. First, defendant contends that the trial judge erred in allowing the state to call Paul as a witness after the state failed to supplement its discovery response to the defendant's request to reveal any deals and after the state led the defense to believe that Paul would not testify.
When the prosecutor called West Paul to testify, defense counsel stated, "If there have been any deals made to West Paul we need to know about them this morning." The prosecutor responded that she was going to put evidence of the deal in the record during Paul's testimony, and defense counsel indicated that he did not object to that method.[4] Consequently, defense counsel's argument that he was "sandbagged" by Paul's testimony at trial does not appear to be supported by the record and was not preserved by a contemporaneous objection.[5]
Moreover, while discovery rules are intended to eliminate unwarranted prejudice arising from surprise testimony and evidence, the state's failure to comply with discovery rules does not bring automatic reversal, and prejudice must be shown. State v. Schrader, 518 So.2d 1024, 1031-32 (La.1988). A review of the record in this case reveals that the defense was able to cross-examine Paul thoroughly on his deal with the state, in which he received a sentence of twenty-five years in exchange for his testimony against defendant, and also on his substantive testimony regarding the murder of Officer Smothers.
*814 Next, defendant contends that West Paul should not have been allowed to testify at trial, because the state and the court knew Paul was going to perjure himself, as evidenced by the fact that Paul's former attorney withdrew from representation.
This contention implicates the decision in Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). To prove a Napue claim, the accused must show that the prosecutor acted in collusion with the witness to facilitate false testimony. When a prosecutor allows a state witness to give false testimony without correction, a conviction gained as a result of that perjured testimony must be reversed, if the witness's testimony reasonably could have affected the jury's verdict, even though the testimony may be relevant only to the credibility of the witness. Id. at 269, 79 S.Ct. 1173. Furthermore, fundamental fairness to an accused, i.e., due process, is offended "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Id. When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
Defendant's argument is wholly unsubstantiated, as he failed to provide any evidence in support of his allegation and merely relies on his bare assertion. We accordingly reject the contention based on this record and relegate defendant to post-conviction relief if evidence in this regard is subsequently obtained.[6]
Defendant also complains that the trial court failed to order the prosecutor to turn over evidence showing that the car, which according to West Paul was used in the commission of the crime, had been impounded by the police the day before the murder.
In his testimony, Paul described the car used in the commission of the charged crime as a four-door Oldsmobile. At one point he referred to the car as a 1980s model, and at another time he described it as a '98 Oldsmobile. He said that it was in street terms known as a rental car, meaning it was given for use in exchange for drugs. When asked on cross-examination whether there was anything distinctive about the car, Paul stated that the back windshield was out.
After Paul testified, the defense realized that the car described by Paul possibly matched the description of a car which had been impounded by the police on January 6, 1993, the day before the murder at issue. According to an article in the Baton Rouge newspaper, Kevan Brumfield admitted that he was one of two men who ran from the vehicle the day before the murder of Officer Smothers, and police suspected that West Paul was the other man. Based upon that information, defense counsel filed a supplemental motion for Brady and Giglio material, requesting documents relevant to the seizure of the vehicle and particularly a copy of the initial offense report in the matter. After hearing argument on the motion during a recess at trial and apparently after reviewing the police impoundment records, the judge ruled that the car could not be connected to Brumfield through the documents and denied the motion.
The trial judge erred in refusing to order the prosecutor to turn over the police report regarding the seizure of the vehicle and the documents which showed that the vehicle was impounded from January 6 through January 15. The documents could have been used to impeach Paul's testimony *815 in which he claimed he, Brumfield and defendant committed the charged crime using a car that was strikingly similar to the impounded vehicle, primarily because of the missing back window.
Nevertheless, to be reversible, any error in refusing to order production of documents must undermine confidence in the verdict. Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Although the materials would have allowed the defense to attack Paul's recall of events and thereby question his credibility, the erroneous description of the vehicle does not really suggest that he fabricated his remaining testimony, in which he admitted he was a willing participant in the crime. Moreover, the surviving victim's positive identification and defendant's own inculpatory statement suggest that any error in this regard did not undermine confidence in the verdict.
Defendant additionally contends that the trial court erred by not requiring the prosecutor to disclose the identity of the confidential informant who initially led the police to Kevan Brumfield and Eddie Paul.
Detective Denicola testified that he received a phone call on the morning of the murder from a confidential informant, who told him that Brumfield was involved in the killing of Officer Smothers and that Eddie Paul knew the details of the crime. According to Denicola, the informant, who had been used in the past and had provided accurate information between thirty to forty times during the previous four or five years, identified Brumfield from a picture as the man he overheard telling Eddie Paul that he killed Officer Smothers.
A confidential informant's identity is privileged, absent exceptional circumstances. State v. Oliver, 430 So.2d 650 (La.1983). However, the privilege is not absolute. The courts use a balancing test for determining when the confidential informant's name must be revealed to the defense. Roviaro v. United States, 353 U.S. 53, 62, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); State v. Davis, 411 So.2d 434, 436 (La.1982). Under this test, the public interest in protecting the flow of information must be balanced against the individual's right to prepare his or her defense.
When an accused shows that disclosure of the informant's identity is essential for his or her defense, the identity must be revealed. State v. Davis, 411 So.2d at 436. However, the burden rests with the accused to set forth concrete reasons why the identity of the informant is crucial to the defense. Thus, the accused "must convince the court that the informant may be able to give testimony which is necessary to a fair determination of the issue of guilt or innocence." State v. Davis, 411 So.2d at 436-37. When an informant has played a crucial role in the criminal transaction and when his or her testimony is necessary to insure a fair trial, disclosure of the identity should be ordered. See State v. Theriot, 369 So.2d 708, 708-09 (La.1979).
In the present case, defendant claims that the identity should have been revealed because the informant was present when Brumfield made the statement that he shot Smothers and Brumfield made no mention of defendant's involvement. He argues that the informant would have provided an independent witness to a statement against penal interest by Brumfield that exculpated the defendant. In addition, defendant contends that the informant's testimony could have been used to impeach West Paul.
In Davis, the accused argued that disclosure was necessary because "it is conceivable that the confidential informant, the only witness to the transaction, would have testified contrary to the state's interest." Id., 411 So.2d at 437. The court in Davis determined that the accused had failed to meet his burden of proving exceptional circumstances. In the present case, defendant's argument, similar to the one in Davis, is speculative at best. The fact *816 that Brumfield, in his alleged admission to shooting Officer Smothers, did not mention defendant (or West Paul) does not indicate that defendant (or West Paul) was not involved in the crime. Accordingly, defendant has failed to provide the exceptional circumstances necessary to outweigh the public interest in protecting the informant's identity.
Finally, defendant contends that the trial judge erred in denying production of Eddie Paul's and Deron Brooks' statements. However, defendant does not suggest what exculpatory information the statements contained and simply argues that the statements should have been turned over as an investigative tool for the defense just in case they might lead to some exculpatory or impeachment evidence. Consequently, defendant has failed to show that the statements constitute Brady evidence that should have been turned over to the defense.

Defendant's Allegedly Coerced Confession
Defendant complains that his confession was coerced by police brutality and threats.
At the motion to suppress the confession, as well as at trial, defendant testified in great detail about physical abuse by various police officers and the threats they made during his interrogation. He testified: the police came to his house at 4:30 a.m., burst into his room, and closed the door behind them; Detectives Sansone and Brewer drove him to the side a school building, where Brewer rubbed his pistol in defendant's face and made "suggestive statements;" he was then driven to the police station, where he was interrogated by various officers, but he kept telling them that he did not know anything; Detectives Smith and Odom came into the interrogation room and asked him questions, and when he did not know the answers they wanted, they slapped him, kicked him, and dug their fingernails into the back of his ear; when he continued to proclaim his innocence after Detectives Browning and Sansone came into the room, Browning grabbed him in a choke hold and threatened to break his neck; when he still would not cooperate, Sansone, Brewer and Detective Rice put a plastic bag over his head, told him that Smothers was a close friend and that he was going to pay for what he did, stuck pictures of Smothers in the bag, and then tightened it so that he could not breathe; at the same time, Rice hit him in the chest six or seven times; finally, they removed the bag from his head and asked him to sign some statements, but he refused; he asked for a lawyer and for one phone call, but was denied; Brewer read a few statements and asked if that is what he thought had happened the night of the murder, and he said that he did not know; Brewer then asked him to sign the statement, and again he refused; and Brewer then took his hand and forced him to initial the statements.
At the motion to suppress, all eight detectives who took part in Broadway's arrest, transportation and interrogation testified, denying that defendant was ever threatened, intimidated, coerced, or verbally or physically abused.
During the trial, each of the detectives specifically denied defendant's assertions of coercion. Detective Odom testified that he never hit defendant. Detective Sansone testified that he never saw Detective Brewer rub a gun across defendant's face when he and Brewer transported defendant to the station. He also denied that they threatened or hit defendant, or handed a bag to Rice to be placed on defendant's head. Detective Smith specifically denied that he ever dug his fingernails into the area behind defendant's ears and denied that he kicked defendant.
Before a confession or inculpatory statement can be introduced into evidence, the state must prove beyond a reasonable doubt that the statement was made freely and voluntarily and not under the influence of fear, duress, intimidation, menace, *817 threats, inducements or promises. La. Code Crim. Proc. art. 703; La.Rev.Stat. 15:451; State v. Vessell, 450 So.2d 938, 942 (La.1984). When an accused alleges specific instances of police misconduct in reference to a confession, the state must specifically rebut the allegations. Vessell, 450 So.2d at 942-43.
In the present case, the state specifically rebutted defendant's testimony as to numerous instances of misconduct by the police, both before and during his interrogation, by presenting all the officers involved that night, who specifically described their actions and denied that any misconduct took place.
The trial judge, faced with contradictory testimony which calls for a determination of the credibility of the witnesses, obviously disbelieved the version presented by defendant and found credible the testimony of the eight detectives involved. Such credibility determinations lie within the sound discretion of the trial judge, and his ruling will not be disturbed unless clearly contrary to the evidence. Vessell, 450 So.2d at 943. The jury at trial also heard defendant's testimony about the circumstances surrounding his statement, as well as the contradictory testimony of the eight officers. In determining the weight to be given the statement under La.Code Crim. Proc. art. 703G, the jury made a credibility determination and accepted the officers' version.
The record thus provides a reasonable basis for the jury's credibility determination. This court should not disturb that determination unless it was substantially affected by the improperly admitted hearsay evidence of Brumfield's implication of defendant in the crime.

Harmless Error
The critical issue in this case is whether reversal of the conviction and sentence is required because of the prosecutor's flagrant presentation of hearsay evidence to inform the jury that Kevan Brumfield, who had been convicted of the crime and sentenced to death, named defendant as the other perpetrator of the attempted robbery and murder, followed by the prosecutor's improper closing argument emphasizing the assertive content of Brumfield's statement that she had represented to the court was not offered for the truth of the statement.
Confrontation errors are subject to a harmless error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The correct inquiry is whether the reviewing court, assuming that the damaging potential of the cross-examination were fully realized, is nonetheless convinced that the error was harmless beyond a reasonable doubt. Id. at 684, 106 S.Ct. 1431. Factors to be considered by the reviewing court include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contracting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Id. at 684, 106 S.Ct. 1431; State v. Wille, 559 So.2d at 1332. The verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial is surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
The principal evidence of guilt offered by the prosecutor consisted of the eyewitness identification of defendant by the surviving victim of the attack, defendant's own statement admitting his participation in the attempted robbery and murder, the testimony of co-participant West Paul after a deal with the state, and the hearsay testimony of co-perpetrator Kevan Brumfield. The latter evidence clearly should have been excluded, and the determinative question is whether the jury would have convicted defendant and sentenced him to death in the absence of this evidence.
*818 In State v. Wille, 559 So.2d 1321, 1332-33 (La.1990), this court determined that the confrontation error was harmless beyond a reasonable doubt since the hearsay testimony was essentially cumulative of the much more detailed information contained in defendant's own confession, which had not been substantially challenged as involuntary and which had been fully corroborated by numerous evidentiary links between the defendant, the victim and the crime.
In State v. Hearold, 603 So.2d 731 (La.1992), this court held that a police officer's hearsay testimony that "[w]e had received information that [the defendant] and [the defendant's companion] were involved in narcotics dealings in the eastern part of the parish" violated Hearold's confrontation rights and served no other purpose than to inform the jury by improper evidence that Hearold was a drug dealer. Because this error was compounded by unresponsive and improper answers by officers designed to get the point across to the jury that defendant was a drug dealer, we held that these errors were not harmless beyond a reasonable doubt as to the sufficiency of the evidence of intent to distribute illegal drugs.
In the present case, there was a confession by the defendant, as in Wille, but it was not recorded, was not as detailed as Wille's confession, and was challenged as involuntary. However, even if the jury's credibility determination in rejecting defendant's version of the taking of his confession was arguably influenced to some extent by the improper hearsay identification statement of Brumfield, the eyewitness identification of the surviving victim (which occurred after hypnosis but was not induced thereby) and the testimony of co-perpetrator West Paul (which was properly subjected to significant cross-examination about the deal with the state and prior conflicting statements) were virtually unassailed. The testimony by Paul is particularly important in the harmless error analysis because the confrontation violation by the deliberately presented hearsay evidence of a co-perpetrator (Brumfield) dims in significance when there is cumulative evidence of defendant's participation given by the proper testimony of another co-perpetrator (West Paul).
After considering all of the Van Arsdall factors, we conclude that the very serious confrontation error was harmless beyond a reasonable doubt.

Capital Sentence Review
Under La.Code Crim. Proc. art. 905.9 and La.Sup.Ct.R. 28, this court reviews every sentence of death to determine if it is constitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
According to the judge's Uniform Capital Sentence Report and the state's Capital Sentence Review Memorandum, defendant was twenty-three years of age on the date of the crime. He completed the tenth grade of high school, and his IQ was in the medium range between 70 and 100. Defendant is the oldest of three children born to the union of Debra Broadway and Henry Odom, who was shot and killed around 1980. Defendant worked sporadically from 1990 until the date of his arrest for the current offense. He worked as a janitor for a maintenance company between 1991 and 1992. In 1991, he worked stocking produce at a grocery store for approximately six months, but was disabled by a workplace injury for the majority of that time and was ultimately fired for not showing up for work. He also worked in 1992 at a fast food outlet and as a laborer at a paper mill, but held each job for six months or less. Defendant has never been married and does not have any children.
*819 As a juvenile, defendant was committed in June of 1987 for burglary. He was subsequently sent to the Louisiana Training Institute in January of 1988, and later in 1988 placed in the Baton Rouge Marine Institute where he spent four months. In July of 1988, defendant was arrested for misdemeanor theft and was subsequently sentenced to one year of unsupervised probation. In January 1989, defendant was convicted of criminal damage to property, for which he was sentenced to ninety-one days, suspended, and was placed on one-year supervised probation. This probation was terminated as unsatisfactory on January 19, 1993. In April 1990, defendant was arrested for driving while intoxicated, pleaded guilty, and was sentenced to two years of supervised probation, which was terminated as unsatisfactory in September 1992.

1. Passion, Prejudice, or Other Arbitrary Factors

There is no indication in the record of passion, prejudice, or arbitrariness. Both the defendant and the victim were African-American, and nothing in the record suggests that race was an issue at trial.
The case received extensive news media coverage. However, jurors were questioned about exposure to media coverage during voir dire, and defendant's trial took place three years after the offense occurred.

2. Aggravating Circumstances

There clearly was sufficient evidence to prove the aggravating circumstances that defendant was engaged in the perpetration of an attempted armed robbery, that defendant knowingly created a risk of death or great bodily harm to more than one person, and that defendant intended to kill a peace officer engaged in her lawful duties. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

3. Proportionality

The federal Constitution does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Wille, 559 So.2d 1321 (La.1990). Nevertheless, this court has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, concluding in that one case that there were a sufficiently "large number of persuasive mitigating factors," particularly the dominating influence of defendant's older brother. State v. Sonnier, 380 So.2d 1 (La.1979).
Jurors in the Nineteenth Judicial District have recommended imposition of the death penalty on approximately sixteen occasions. The jury in the case of Kevan Brumfield, the other shooter involved in the instant crime, also returned a death verdict that has been affirmed by this court. State v. Brumfield, 96-2667 (La.10/20/98), 737 So.2d 660.
Several of the salient features of the instant case make it similar enough to other death sentences recommended by juries that defendant's sentence is not disproportionate. See State v. Williams, 96-1023 (La.1/28/98), 708 So.2d 703 (eighteen-year-old defendant murdered victim while attempting to rob him in his truck; earlier that day, defendant had shot and wounded another victim during the attempted perpetration of an armed robbery); State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865 (seventeen-year-old defendant kidnapped the victim while stealing his truck and ultimately drove him to a secluded area and shot him three times in the head); State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326 (nineteen-year-old defendant, while engaged in the armed robbery of employees at a Church's Fried Chicken, shot and killed one of the employees); State v. Taylor, 93-2201 *820 (La.2/28/96), 669 So.2d 364 (during the armed robbery in the Cajun Fried Chicken restaurant where defendant had previously been an employee, he shot and killed one employee and shot and permanently disabled and paralyzed another); State v. Williams, 383 So.2d 369 (La.1980) (defendant shot and killed the victim during an armed robbery of an A & P Grocery Store).[7]

Decree
For the reasons assigned herein, defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under La.Code Crim. Proc. art. 923 of finality on direct appeal, and before signing the warrant of execution, as provided by La. Rev.Stat. 15:567 B, immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La.Rev.Stat. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
NOTES
[*] Traylor, J., not on panel. Rule IV, Part 2, § 3.
[1] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is part of the official record.
[2] There was no objection to this clearly improper argument. Although defense counsel had unsuccessfully objected to the hearsay evidence itself, he arguably should have objected again when the prosecutor went back on her representation that the evidence was not being offered for its assertive content. Nevertheless, the prejudicial words used in the argument came out without warning, and since the bell could not be unrung, defense counsel may have made a strategic decision not to emphasize the improper argument to the jury. In any event, the court can consider the argument in evaluating the issue as to harmless error.
[3] Certain details did emerge in the hypnotic session, principally that the assailant had brown eyes and may have had salt and pepper hair, and that the camouflage jacket worn by the assailant appeared oversized and came down over his wrists. The latter detail was emphasized before the jury when defendant, upon request, put on the camouflage jacket seized from his bedroom, and the jacket was too large and came down over his wrists.
[4] More than two months before trial, the prosecutor filed a supplemental response to the defense's motion for discovery and inspection, stating that she intended to use "all statements of West Paul and Kevan T. Brumfield witnessed by John Lewis, Cassandra Holmes, and Eddie Paul during the course of the conspiracy."
[5] Defense counsel did complain, in his motion for a new trial, about the sudden appearance of West Paul as a state witness. During argument on the motion, the prosecutor explained that she had entered into preliminary negotiations with Paul's attorney just as jury selection was about to begin in the case. The prosecutor did not meet personally with Paul until jury selection was underway. The details of the deal were then worked out five days before Paul took the stand in the lengthy trial. The prosecutor conceded that she had not immediately informed the defense, but maintained she had kept silent about the deal to protect Paul while he stayed in prison awaiting his turn to testify. This court does not address the merits of that explanation, because defense counsel acquiesced in the sudden appearance of Paul as a witness and did not press for any of the remedies provided by La.Code Crim. Proc. art. 729.5 for discovery violations.

Moreover, defense counsel, after cross-examining Paul for almost two hours, indicated during a lunch recess that he might require a continuance to prepare for effective cross-examination of Paul as to numerous inconsistencies between his testimony at trial and the videotaped statement he earlier gave to police. Defense counsel argued at one point that he required a continuance because the deal was not cut until the week before and because they were not aware that he was going to testify, and were "caught a little bit off guard." However, once the prosecutor indicated that she did not have an objection to the playing of Paul's entire taped statement for the jury, defense counsel withdrew his request for a continuance and proceeded with the cross-examination.
[6] The prosecutor filed a motion to supplement the record with sealed evidence refuting the allegations of collusion to facilitate false testimony. Because of our disposition of this contention, the court now denies the motion, and the evidence may be used if post-conviction relief is eventually sought based on this contention.
[7] Three other similar cases ultimately ended in reversal of the defendant's death sentence, removing them from consideration in proportionality review. See State v. Clark, 492 So.2d 862 (La.1986) (defendant shot and killed an employee of Studebaker's Lounge while engaged in an armed robbery; original sentence of death set aside and life sentence imposed after remand); State v. Clark, 387 So.2d 1124 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 900, 66 L.Ed.2d 830 (1981), rev'd on habeas proceedings, Clark v. Louisiana State Penitentiary, 694 F.2d 75 (5th Cir.1983) (defendant stabbed and shot the night manager of the Red Lobster Restaurant to death during an armed robbery; after federal habeas corpus relief, he pleaded guilty with a life sentence); State v. Williams, 392 So.2d 619, 620 (La.1980) (defendant shot and killed an Exxon service station employee during an armed robbery; jury recommended death, but the sentence was reversed and another jury in a new trial recommended life).