# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-874


STATE OF LOUISIANA

VERSUS

MILTON ANTHONY WILKS


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR98483.1
HONORABLE GLENNON P. EVERETT, DISTRICT JUDGE

**********

**MARC T. AMY**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Marc T. Amy and Elizabeth A. Pickett, Judges.

**AFFIRMED.**

Cooks, J., dissents and assigns written reasons.

**Michael Harson**
**District Attorney**
**Alan P. Haney**
**Assistant District Attorney**
**Post Office Box 3306**
**Lafayette, LA   70502**
**(337) 291-7009**
**COUNSEL FOR APPELLEE:**
        State of Louisiana

**W. Jared Franklin**
**Louisiana Appellate Project**
**3001 Old Minden Road**
**Bossier City, LA   71112**
**(318) 746-4767**
**COUNSEL FOR DEFENDANT/APPELLANT:**
        Milton Anthony Wilks

AMY, Judge.

The defendant was charged by bill of information with purse snatching. After a jury trial, the defendant was found guilty. The trial court sentenced him to sixteen years imprisonment at hard labor. The defendant now appeals, questioning the sufficiency of the evidence presented and the timeliness of the prosecution. He also contends that his sentence is excessive. For the following reasons, we affirm.

## Factual and Procedural Background

On March 22, 2003, Mary Varisco was shopping at Sam's Club in Lafayette when she felt what she described as "kind of like a brushing-up-against feeling." She testified that after experiencing this feeling, she looked down and noticed that her wallet was missing. She explained that she confronted the defendant, who was nearby, and saw that he had her wallet in his hand. The defendant then began walking toward the exit. Several of the store customers followed the defendant into the parking lot. Police were called to the scene.

Police Officer Brad Robin arrived on the scene after receiving information that the suspect was chased to the vicinity of a nearby business. Upon investigating the area, Officer Robin found the defendant hiding in some bushes. The officer then drove the defendant back to the store, where the victim and another witness identified the defendant as the offender. The officer read the defendant his *Miranda* rights and he confessed to the crime.

On June 4, 2003, the defendant, Milton Anthony Wilks, was charged with purse snatching, a violation of La.R.S. 14:65.1, in connection with the above occurrence. On September 30, 2008, a jury found him guilty as charged. On March 2, 2009, the trial court sentenced him to sixteen years imprisonment at hard labor.

The defendant now appeals, asserting that: (1) There is insufficient evidence to convict him of purse snatching; (2) The trial court erred in denying his motion to quash because the time limitations to commence trial had expired, and; (3) The sentence imposed is excessive.

**Discussion**

*Sufficiency of the Evidence*

In his first assignment of error, the defendant argues that the evidence adduced at trial does not support his conviction under the *Jackson* standard.[1] Specifically, he argues that the identification of him as the offender was unreliable because the police used suggestive identification procedures.

On review, the court must examine the reliability of an identification according to the five-factor analysis provided by the United States Supreme Court in *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. (1977). The Louisiana Supreme Court has described that analysis as follows:

> In *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Court held that an identification may be permissible, despite the existence of a suggestive pretrial identification, if there does not exist a "very substantial likelihood of irreparable misidentification." The factors which courts must examine to determine, from the totality of the circumstances, whether the suggestiveness presents a substantial likelihood of misidentification include (1) the witness' opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. *Id*. at 114, 97 S.Ct. 2243.

---

[1] In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), the United States Supreme Court held that the test to be applied in determining whether evidence is sufficient to support a verdict is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*State v. Broadway*, 96-2659, p. 14 (La. 10/19/99), 753 So.2d 801, 812, *cert. denied*, 529 U.S. 1056, 120 S.Ct. 1562 (2000).

A review of the record in the present case suggests that these factors weigh against the defendant. The victim, Ms. Varisco, testified that she was at arms' length from the defendant and looked at his face for approximately ten seconds. Officer Robin testified that when he responded to the call, Ms. Varisco described the defendant as a "tall, lanky black male wearing a black shirt and . . . glasses." Officer Robin testified that he found "a six [foot] tall black male with a black shirt, blue jeans, and glasses" in the bushes. Also, Officer Robin returned with the defendant within ten minutes of receiving the Ms. Varisco's identification and she again identified him as the offender.

In regard to the fourth *Brathwaite* factor, the record evidences that Ms. Vascaro displayed a high degree of certainty regarding her identification as the offender. *Brathwaite*, 432 U.S. 98, 97 S.Ct. (1977). At trial, the following exchange took place:

Q    And this person that you saw when you turn[ed] him around, is that person in the courtroom right now?

A    Yes, he is.

Q    Now, does he look the same now as he did then?

A    Well, I don't remember him having a beard.

Q    Okay

A    But, yes, he does look very similar. He doesn't have the glasses on that he had at the time. Yes.

Q    Does he look very similar or - -

A    He looks - - it's him. It's absolutely him.

The record indicates that the jurors, as the trier of fact, accepted Ms. Varisco's and Officer Robin's testimony as credible. These credibility determinations are within the sound discretion of the trier of fact and will not be disturbed on review unless clearly contrary to the evidence. *State v. Marshall*, 04-3139 (La. 11/29/06), 943 So.2d 362. Ms. Varisco testified as to the events of the purse snatching and identified, in open court, that defendant was the offender who committed that crime. Officer Robin also identified the defendant in open court and testified that, while in his squad car, the defendant confessed to the crime. In light of the evidence presented, we find that a rational trier of fact could have found the defendant guilty of purse snatching pursuant to the *Jackson* standard of review. *Jackson*, 443 U.S. 307, 99 S.Ct. 2781.

This assignment lacks merit.

*Time Limitations*

In his second assignment of error, the defendant alleges that the time limitations to commence trial expired in his case.

Louisiana Code of Criminal Procedure Article 578[2], sets a two-year period for the State to institute prosecution of a non-capital felony. This time period is subject to interruption under La.Code Crim.P. art. 579, which reads:

---

[2] Louisiana Code of Criminal Procedure Article 578, reads as follows:

A. Except as otherwise provided in this Chapter, no trial shall be commenced nor any bail obligation be enforceable:

(1) In capital cases after three years from the date of institution of the prosecution;
(2) In other felony cases after two years from the date of institution of the prosecution; and
(3) In misdemeanor cases after one year from the date of institution of the prosecution.
B. The offense charged shall determine the applicable limitation.

A. The period of limitation established by Article 578 shall be interrupted if:

(1) The defendant at any time, with the purpose to avoid detection, apprehension, or prosecution, flees from the state, is outside the state, or is absent from his usual place of abode within the state; or

(2) The defendant cannot be tried because of insanity or because his presence for trial cannot be obtained by legal process, or for any other cause beyond the control of the state; or

(3) The defendant fails to appear at any proceeding pursuant to actual notice, proof of which appears of record.

B. The periods of limitation established by Article 578 shall commence to run anew from the date the cause of interruption no longer exists.

The defendant was charged on June 24, 2003, with purse snatching. The court minutes provide that the defendant was arraigned and pled not guilty on September 23, 2003. The record provides a court summons issued on that date. The court summons ordered the defendant to appear in court for pretrial on October 30, 2003, and for trial on December 1, 2003. The record indicates that there is a signature affixed to the court summons under the sentence "I promise to appear at the time, place and date shown above." The court minutes of October 30, 2003, indicate that the defendant failed to appear and a bench warrant was issued for his arrest. The October 30, 2003 minutes also indicate that the State introduced evidence showing service on all parties. On November 14, 2003, the bench warrant issued on October 30, 2003 was recalled. On December 1, 2003, the minutes again indicate that the defendant failed to appear in court. On that date, another bench warrant was issued and the State, again introduced evidence showing service on all parties.[3]

---

[3] The December 1, 2003 minutes read, as follows:

THE ACCUSED WAS NOT PRESENT IN OPEN COURT AND NOT REPRESENTED BY COUNSEL. THIS MATTER WAS PREVIOUSLY SCHEDULED THIS DATE AND DUE TO THE

The defendant next appeared in court on October 30, 2007 following an arrest on October 25, 2007. At the hearing, the trial court did not recall the warrant which was issued on December 1, 2003 and the matter was set for trial. On March 13, 2008, the defendant filed a motion to quash the prosecution based upon prescription. The trial court denied the motion and the trial began on September 29, 2008.

The defendant argues that the trial court erred in denying his motion to quash because of the two-year time limitation and that the State failed to prove the existence of any causes for interruption of that time limit. In brief, the State argues that prescription had been interrupted under La.Code Crim.P. art. 579(3) because the defendant had failed to appear in court pursuant to actual notice.

Generally, the State bears the heavy burden of proving that it is excused from trying the accused at a later date than the period mandated under La.Code Crim.P. art. 578. *State v. Romar*, 07-2140 (La. 7/1/08), 985 So.2d 722. However, our supreme court has held La.Code. Crim.P. art. 573(3) "does not impose on the state the affirmative duty to search for a defendant who has failed to appear for trial after receiving actual notice." *Romar*, 985 So.2d at 726. It explained further, as follows:

> The 1984 amendment of La.C.Cr.P. art. 579 made a defendant's contumacious failure to appear for trial after receiving notice, a direct contempt of court, La.C.Cr.P. art. 21(A)(1), a ground of interruption of the time limits in La.C.Cr.P. art. 578 for bringing him to trial, without regard to whether he thereby intended to avoid prosecution altogether by rendering himself a fugitive from justice, or whether he had otherwise placed himself beyond the control of the state to secure his presence for trial.

*Id.*

---

NONAPPEARANCE OF THE ACCUSED A BENCH WARRANT WAS HEREBY ISSUED FOR THE ARREST OF THE ACCUSED AND THE BOND IS HEREBY ORDERED FORFEITED. THE STATE INTRODUCED THE ENTIRE FILE SHOWING SERVICE ON ALL PARTIES, AS WELL AS THE BOND CONTRACT.

In the present case and pursuant to La.Code Crim.P. art. 578, an interruption of the time limit occurred when the defendant failed to appear for trial on December 1, 2003. The record reveals that the defendant had actual notice of this trial date in the summons issued on September 23, 2003. The court summons was an order for the defendant to appear in court for pretrial on October 30, 2003, and for trial on December 1, 2003. The record indicates that there is a signature affixed to the court summons under the sentence "I promise to appear at the time, place and date shown above." Furthermore, the bench warrant which was issued on December 1, 2003 indicates that a notice to appear was served on the defendant.

The record evidences that the State met its burden in proving that an interruption of prescription occurred under La.Code Crim.P. art. 579(3). The State entered into the record the signed summons, bench warrants, and court minutes which evidence that the defendant failed to appear in court pursuant to actual notice. Therefore, we do not find that the trial court abused its discretion in denying the defendant's motion to quash. *See State v. Love*, 00-347 (La. 5/23/03), 847 So.2d 1198.

This assignment lacks merit.

*Excessiveness of Sentence*

In his final assignment of error, the defendant argues that his sixteen-year sentence is excessive. This court has set out a standard to be used in reviewing excessive sentence claims, as follows:

> La.Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless

imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, 01-1591, p.12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331.

Related jurisprudence adds further structure to the analysis:

In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00); 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, 958.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061.

The sentencing hearing transcript reveals that the trial court addressed the nature of the offender and the offense as follows:

Mr. Wilks, I have reviewed the aggravating and mitigating circumstances listed in the Articles of the Code of Criminal Procedure applicable. I have considered the facts of the incident offense. I have also noted in particular your criminal record, sir. I cannot remember ever having anyone with eleven prior felony convictions. Contrary to Mr. Haney's statement, I believe your convictions are felony convictions.

In any event, sir, a maximum sentence in this case in all likelihood is a life sentence for you because of your age, because you are 58 years old. Under the circumstances I hereby sentence you to serve sixteen years at hard labor. I trust, sir, that gives you some possibility that in your mid-seventies you may be able to get out of prison[,] but I'm not guaranteeing it. I mean, I don't know what will happen to you while in jail. Hopefully, while you are in your mid-seventies you will not break the law again.

I note specifically that your crimes are not crimes of violence, although this particular crime could be considered one. The fact was you didn't hurt anyone. You took the purse from a basket or grocery basket. In any event, sir, you will be given credit for time served.

On review, we cannot find that the trial court abused its discretion in sentencing the defendant to sixteen-years imprisonment. Pursuant to La.R.S. 14:65.1, the defendant faced a sentencing range of two to twenty years imprisonment. The State requested that the maximum sentence be imposed. The trial court did not impose the maximum sentence, however, his sentence does fall within the upper range of possible sentences. The trial court was persuaded to impose an upper range of sentence in consideration of the defendant's extensive criminal history. We do not find that this consideration was an abuse of discretion.

This assignment lacks merit.

### DECREE

For the foregoing reasons, the defendant's conviction and sentence are affirmed.

**AFFIRMED.**

STATE OF LOUISIANA

VERSUS

MILTON ANTHONY WILKS

**COOKS, J., dissenting.**

I respectfully dissent from the majority opinion, finding merit in Defendant's assignment of error that the time limitations to commence trial expired in this case. Therefore, I believe Defendant's conviction must be reversed and his sentence vacated.

The majority relies on *State v. Romar*, 07-2140 (La. 7/1/08), 985 So.2d 722, contending Defendant received actual notice of the trial date, thus, the State was relieved of its duty to locate him for trial. However, in my examination of the record. I do not find that Defendant received actual notice of the trial date. The court in *Romar* stated as follows:

> As a general matter, the state has two years from the institution of prosecution to begin trial of a non-capital felony. La.C.Cr.P. art. 578(A)(2). The statutory periods of limitation "enforce the accused's right to a speedy trial and . . . prevent the oppression caused by suspending criminal prosecutions over citizens for indefinite periods of time." *State v. Rome*, 93-1221 (La.1/14/94), 630 So.2d 1284, 1286; *see United States v. Marion*, 404 U.S. 307, 322, 92 S.Ct. 455, 464, 30 L.Ed.2d 468 (1971)(statutes imposing time limits on trial "provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced."). That period may be enlarged as the result of suspension, La.C.Cr.P. art. 580, or interruption, La.C.Cr.P. art. 579, but in either case, the state "bears the heavy burden of showing that it is excused from trying the accused on a charge later than the period mandated by [La.C.Cr.P. art.] 578." *State v. Chadbourne*, 98-1998, p. 1 (La.1/8/99), 728 So.2d 832 (internal quotation marks and citations omitted). That

burden ordinarily " 'requires the State to exercise due diligence in discovering the whereabouts of the defendant as well as taking appropriate steps to secure his presence for trial once it has found him.' " *State v. Bobo*, 03-2362, p. 5 (La.4/30/04), 872 So.2d 1052, 1055-56 (quoting *Chadbourne* ).

. . . .

We agree with the First and Third Circuits that La.C.Cr.P. art. 579(A)(3) does not impose on the state the affirmative duty to search for a defendant who has failed to appear for trial *after receiving actual notice*. The 1984 amendment of La.C.Cr.P. art. 579 made a defendant's contumacious failure to appear for trial after receiving notice, a direct contempt of court, La.C.Cr.P. art. 21(A)(1), a ground of interruption of the time limits in La.C.Cr.P. art. 578 for bringing him to trial, without regard to whether he thereby intended to avoid prosecution altogether by rendering himself a fugitive from justice, or whether he had otherwise placed himself beyond the control of the state to secure his presence for trial.

*Id.* at 725-26. (emphasis added).

*Romar* indicates that actual notice, not issuance of a bench warrant, is the mechanism that relieves the State of the obligation to locate a defendant. In the present case, the record does not prove Defendant received actual notice of the relevant court dates. The minutes of his September 2003 arraignment do not show he received notice, and there is no transcript of that proceeding in the record. However, the district court clerk's office has provided a supplemental record containing a court summons issued on the same date. The caption bears Defendant's name and the trial docket number, 98483. The summons includes a pretrial date, October 30, 2003, and the trial date, December 1, 2003. Although there is a signature, it *is illegible and does not appear to match the equally illegible signature on his appearance bond.*

During the hearing on Defendant's motion to quash, the presiding judge made the following observations:

THE COURT: Mr. Wilks, this is a rather confusing situation, but, Mr. Wilks, as best I can determine you were arrested back in 2003, apparently, as you describe it, for theft of a wallet. And I do have -- and on that date that you were arrested you used the name Frank Wilks. And

so that's how the case was initially filed, charging a person named Frank Wilks with having committed this crime of theft.

Then you came to an arraignment and then you evidently pled not guilty and it was scheduled for a pretrial conference, and on one of those dates that you were scheduled for a pretrial conference that happened to be September 18, 2003.

On that day you apparently spoke with the lawyer who had been appointed to represent you, his name was Lee Gillespie. He's a large fellow. You remember him? He, apparently, after speaking with you, learned of your real name, that you were, in fact, Milton Anthony Wilks. I assume that he must have had some representation with you previously or a person who was arrested with you on a previous occasion because he reported that he had a conflict of interest and he could not represent you in that case. Do you remember that?

**MR. WILKS:**

A.     Yes, yes.

**MR. GUIDRY:** Judge, for the record, if we could supplement it, what it indicates is that Mr. Gillespie was familiar with the victim.

**THE COURT:** Familiar with the victim. So, therefore, Mr. Gillespie had to get out of the case. And another lawyer was appointed to represent you, his name was Kirk Piccione. Mr. Piccione, since he was new to the case, asked for the trial to be continued. So the trial was continued. Evidently, you and Mr. Piccione had a relationship talking about the case, preparing the case. But then on that date in December, the 1st of December 2003, you did not come to court and so, therefore, a bench warrant was issued. So that means that you were free on bond at that time when you saw me.

**MR. WILKS:**

A.     No.

**THE COURT:** You weren't?

**MR. WILKS:**

A.     Never. I was incarcerated. I was in Lafayette Parish jail.

**THE COURT:** So then there is the mystery of what the date was that you pled guilty to whatever charges in city court that let you get out of jail.

**MR. WILKS:**

**A.** That was in, like, April or something, April or May. The deputy there released me. The deputy over there, she released me.

**THE COURT:** April of 2003, May of 2003, but you see, you still had a court date with me in December of 2003. And so you apparently got out of jail.

**MR. WILKS:**

**A.** I never got out of jail. I stayed in jail the whole time until April or May.

**THE COURT:** Right. April or May you pled guilty to some charges, you have no idea what those charges were.

**MR. WILKS:**

**A.** Yes, it was from the indictment. It wasn't an indictment.

**THE COURT:** I just asked you when you were on the stand if you could tell me all of the things you pled guilty to. You couldn't. So you don't know.

**MR. WILKS:**

**A.** I don't know all of them.

**THE COURT:** I know you don't know. Listen to me. You don't know, that's what I'm telling you, you don't know what you pled guilty to.

**MR. WILKS:**

**A.** No.

**THE COURT:** Therefore, listen. Therefore, listen. You don't know what you pled guilty to. And so, therefore, you got out of jail. You have no idea whether or not you pled guilty to this charge of theft of a wallet that you were arrested for. Okay? When you got out of jail you were happy to be out of jail. You didn't come to the courthouse here to make sure that what you thought was the case in city court, that everything was gone, everything was finished, everything was resolved, you pled guilty to everything, when you thought that you were free you could've come here to this building, the clerk's office.

**MR. WILKS:**

**A.** I had no idea.

**THE COURT:** I know you didn't have any idea. You could have

-4-

if you wanted to have an idea.

**MR. WILKS:**

A.     Because it was my understanding --

**THE COURT:** Stop speaking. Stop speaking. You had a bad understanding. Would you like to have a good understanding?

A.     Yes, sir.

**THE COURT:** That's what I'm trying to give you. In order to receive a good understanding you have to listen and stop speaking and start listening. You left city court happy, thought that everything was resolved. Unfortunately, it seems that you were mistaken. You could have found out your mistake. You could have confirmed that what you thought was truthful was truthful if you had only walked across the street from the jail to this courthouse, come to the clerk's office, checked your file to make sure -- those people over there in city court, they told me everything was finished. I need to be sure that everything is finished. Can you tell me that everything is finished? You didn't do that. You were just happy, you left.

As it turns out everything wasn't finished. We were expecting to see you in December. You did not come in December. You were free. Therefore, I issued a warrant. You weren't in jail when I issued the warrant, you were free because you got out in April or May, according to you. So you were free. Then, apparently, before you were even arrested for this charge you had been in other states, Florida one of them. After you left -- after you were free in April or May of 2003 you traveled to other states.

**MR. WILKS:**

A.     Never Florida. I've never been in Florida.

**THE COURT:** You're speaking again. You can't learn if you speak. And so you traveled to other states. Many other places you visited: sometimes you visited friends, sometimes you just enjoyed life being in other places; but all of that time there was a warrant out for your arrest. At some point you got arrested in Texas for a parole violation and you had to serve two months. You served the two months, you were free. You got out, enjoyed life, traveled hither and yon, went to various places, did various things, had a good time.

Then you came to Lafayette and, unfortunately, some police officer happened to find out that there was a warrant for your arrest at a time when you were in that officer's presence. He arrested you, brought you to jail. That is apparently what happened. Unfortunately, that means, the motion to quash is denied. Good luck to you, sir.

The judge made reference to a pretrial conference date of September 18, 2003, the appointment of attorney Lee "Gillespie," that attorney's withdrawal, the subsequent appointment of attorney Kirk Piccione, and a continuance filed by Piccione. However, the record does not document all of these events.

On September 15, 2003, the local Public Defender's Office filed a letter revoking the appointment of Eric Neumann as Defendant's counsel, and appointing Lee Gallaspy. A supplemental record provided by the district court clerk's office shows that Lee Gallaspy's appointment was revoked in October 2003, and Randy Lasseigne was appointed. In February 2008, Lasseigne's appointment was revoked, and Burton Guidry was appointed. By affidavit, the deputy clerk of court states the record does not contain any documents reflecting that Piccione was appointed as Defense counsel, and does not contain any pleadings filed by Piccione.

At the hearing, Defendant took the stand and denied he received notice of the specific dates he was to appear in court, but acknowledged being aware of the charge. Defendant testified he thought he had pled guilty to the charge at issue, along with other charges, in city court. However, Defendant stated his plea in city court resulted in his release from jail in April or May of 2003. This assertion does not advance his case, since his arraignment on the present charge occurred in September 2003.

However, the court summons in this case does not constitute proof that Defendant received actual notice of the dates. Anybody could have scrawled the purported signature that appears on the summons. At the hearing on the motion to quash, there was no attempt to authenticate the signature. The matter of notice was not addressed at all, but the State, Defense counsel, and the trial court appear to have assumed that notice took place. However, as already mentioned, Defendant testified, and denied receiving notice. Therefore, I do not find the record demonstrates that

Defendant received actual notice. La.Code Crim.P. art. 579(A)(3) and *Romar* are not applicable.

Without proof of actual notice, the State labors under the heavy burden of demonstrating that it exercised due diligence in trying to locate Defendant. The State contends it "did in fact seek to extradite the [D]efendant from Alabama when he was arrested there." At the hearing on the motion to quash, the State introduced a copy of a detainer request faxed by the Lafayette Parish Sheriff's Department to the Shelby County Jail. The fax does not identify the state that Shelby County is in, but the fax number includes the 205 area code. The 205 area code does include Birmingham, Alabama, and at the hearing below, Defendant acknowledged going to Birmingham in 2003 after leaving Lafayette, and to having been arrested there. However, the jurisprudence indicates the State's action did not constitute due diligence in the present context. The Louisiana Supreme Court in *State v. Bobo*, 03-2362 pp. 7-11, concurrence pp. 1-2 (La. 4/30/04), 872 So.2d 1052, 1057-61 (footnotes omitted), explained:

> Nevertheless, even assuming that merely by residing at his usual place of abode in Texas, Bobo, because he was "outside the state" when indicted, was a fugitive for purposes of La.C.Cr.P. art. 579(A)(1), it is undisputed that a time came when the State learned of his whereabouts and had within its power the ability to obtain the custody of him. Once the State located Bobo in custody in Texas, it had the affirmative duty to take steps to secure his presence in Louisiana for trial. *See* [*State v.*] *Amarena*, 426 So.2d [613] at 618 [(La.1983)] ("Any interruption of the period of limitation which existed under La.C.Cr.P. art. 579(A)(1) ceased when the State learned of the incarceration, location and availability of the defendant, and the two year prescriptive period began to run anew from that time."); [*State v.*] *Devito*, 391 So.2d [813] at 816 [(La.1980)] ("After receiving notice of the defendant's whereabouts [in jail], the State was no longer unable to act in apprehending the defendant or unable to obtain his presence for trial by legal process . . . it necessarily follows that any interruption of the period of limitation which existed under Article 579(1) or (2) ceased when the State regained its capacity to act.").

> In fact, the State, fully aware of Bobo's whereabouts, initiated

extradition proceedings through the Louisiana Governor's Office on May 5, 2000. The State contends that because Bobo was incarcerated in Texas, under La.C.Cr.P. art. 579(A)(2), it satisfied its burden of due diligence in attempting to try the accused timely by initiating extradition proceedings and that it therefore had the right to rely on the form letter from the Huntsville prison authorities that it would be informed of Bobo's release on his Texas sentence.

By its plain terms, Article 579(A)(2) provides a cause of interruption only when the State cannot secure the person by legal process or by other cause beyond its control. The State's argument that Bobo's incarceration in Texas impeded its ability to try him timely here seemingly seeks to reprise this court's holding in *State v. Dupree*, 256 La. 146, 235 So.2d 408 (1970), *overruled, Devito*, 391 So.2d at 816. Dupree held that interruption of time limits on trial, which began when the defendant escaped to Mississippi, did not end with his incarceration in that state for another offense and continued until his release from jail on that sentence. However, as the holdings in *Amarena*, and *Devito* show, this Court no longer subscribes to its decision in *Dupree*.

In this case, the prosecuting authority in Ouachita Parish knew or should have known that Texas and Louisiana participate in the Uniform Criminal Extradition Act under which the governor of a participating state, in his or her discretion, may either surrender the accused to the demanding state, or hold the accused until tried and charged, or convicted and punished in the asylum state. *See* La.C.Cr.P. art. 272, providing:

> If a criminal prosecution against the demanded person is pending under the laws of this state, or if he has been convicted in a court of this state but not completely satisfied his sentence, the governor may, in his discretion, surrender him on demand of the executive authority of the other state. The surrender must be pursuant to a re-extradition agreement . . .

Cf. Tex.Code Crim. Proc. Art. 51.13, § 19, providing:

> If a criminal prosecution instituted against such person under the laws of this State and is still pending, the Governor, in his discretion, either may surrender him on demand of the Executive Authority of another State or hold him until he has been tried and discharged or convicted and punished in this State.

Here, Governor Foster complied with the Uniform Criminal Extradition Act by appending the requisite re-extradition agreement to the State's extradition demand and, to protect its own interests, the State could not reasonably rely on the form letter sent by the prison authorities at Huntsville as the response of the governing executive authority in Texas

to Louisiana's formal demand through its chief executive for the surrender of Bobo. In other words, the State had a duty under Article 579 not only to initiate extradition proceedings in the present case, but also to inform itself of the outcome of the proceedings in the event, as happened, that Texas made the demanded person available to the custody of Louisiana officials. Although Bobo refused to waive extradition after Texas Governor Bush signed the extradition order, by October 12, 2000, when the Texas appellate court affirmed the judgment of the district court ordering his surrender to Louisiana officials, he was no longer beyond the legal processes of the State. Thus, prescription once more began to run against the State on October 12, 2000 when the Texas appellate court affirmed the decision of the district court under the extant extradition warrant issued by the Texas Governor's Office. This prescriptive period was not thereafter interrupted for more than two years and the arraignment of defendant on December 2, 2002 clearly falls beyond this prescriptive period.

It appears from the record that a breakdown in communication occurred between the Texas and Louisiana authorities when the officials at Huntsville failed to follow the express instructions of the Extradition coordinator in the Governor's Office and did not notify the Ouachita Parish Sheriff's Office that extradition proceedings had been completed and that Bobo was available for transport to Louisiana although he was still serving his sentence in Texas. Nevertheless, the fact remains that by failing to make any inquiries regarding the extradition proceedings, the State neglected to take reasonable steps to apprise itself that any cause of interruption as a matter of Article 579(A)(1) or (2) had ceased to exist as of October 12, 2000, and that the two-year period for bringing Bobo to trial in Louisiana for his alleged crimes had begun to run anew from that date. The State's attempt to rely on the form letter sent by the officials at Hunstville, which makes no reference to the extradition proceedings, as an interruption of prescription under Article 579(A)(1) or (2) is unavailing when in the face of a properly executed warrant of extradition signed by the Texas Governor, a final judgment by the Texas courts on the issue, and this court's overruling of *Dupree* and its progeny. Furthermore, problems encountered by the State in extradition or those caused by its own mismanagement cannot be charged to the defendant. *Devito*, 391 So.2d at 816. As a consequence, the State allowed its prosecution to prescribe while Bobo finished serving his sentence in Texas.

Additionally, this matter is distinguishable from the case in [*State v.*] *Beverly* [448 So.2d 792 (La.App. 2 Cir. 1984)] upon which the State and the lower courts rely. In *Beverly*, it *appeared* that the California authorities had declined to extradite defendant until the completion of his sentence. 448 So.2d at 793. In this case, when Governor Bush signed the extradition warrant, Texas made Bobo available to Louisiana although he had not yet finished serving his sentence in the penitentiary at Huntsville.

Therefore, the trial court erred in denying Bobo's motion to quash the present prosecution filed approximately two months after the period of limitation expired. Although Bobo has shown no prejudice as the result of his continued incarceration on his underlying sentence in Texas for two years after the appellate courts of that state sanctioned his surrender to Louisiana, statutory periods of limitation on the prosecution of cases offer the primary means of enforcing the Sixth Amendment right to a speedy trial "beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced." *United States v. Marion*, 404 U.S. 307, 322, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).

CONCLUSION

Thus, the State's failure to bring Bobo to trial within two years from the date of his indictment was not because his presence could not be obtained by legal process nor due to events beyond its control. Accordingly, we hold that the State has not met its burden of proving that an interruption of the prescriptive period contained in La.C.Cr.P. art. 578 has occurred.

DECREE

For the foregoing reasons, the judgment of the trial court is therefore reversed, the motion to quash is ordered granted, and defendant is discharged from custody on the present charges.

REVERSED.

. . . .

WEIMER, J., additionally concurs with reasons.

. . . .

WEIMER, J., additionally concurring.

With all due respect to the dissenting justices, I cannot allow to go unchallenged the statement that the State was somehow reasonably misled. The form letter issued by Texas prison authorities could not reasonably cause the State to believe that the State of Texas had declined to extradite defendant until the completion of his sentence. This form letter does not lift the State's "heavy burden" of showing that it is excused from trying the accused within the two year period mandated by law.

The form letter on which the dissenting justices rely is a

pre-printed letter which simply acknowledges the awareness of the Texas prison authorities that defendant is wanted in Louisiana and that the Ouachita Sheriff's Office will be notified prior to his release. Absolutely no mention is made of the extradition proceedings. This "acknowledgment" letter, which lists defendant's name, identifying number, and full-term imprisonment date, in no way indicates that the State could not take defendant into custody at an earlier date. As such, the letter states the obvious: the sheriff's office can take him into custody when the defendant completes his sentence. Nothing in the letter indicates he cannot be taken into custody at an earlier date. Additionally, the letter is addressed to the sheriff's office, not to the district attorney.

Considering the formal request for extradition signed by the governor of Louisiana, the properly executed warrant of extradition signed by the Texas governor, and the final judgment of a Texas court ordering extradition of the defendant, it cannot reasonably be argued that the "form" letter issued from the Texas authorities to the Ouachita Parish Sheriff's Office misled Louisiana authorities into believing that the State of Texas had declined to extradite defendant until the completion of his sentence. The State, having initiated the extradition process, had a duty to follow the process to its conclusion. Nothing in the record indicates the State of Louisiana was prevented from determining the extradition proceeding had concluded with a court order of extradition.

The dissenting justices' view that the form letter, which makes no mention of the extradition process, conferred some reasonable basis for the State's complete abdication of its responsibility to follow up on action the State initiated is not supported by the record in this case.

In the present case, the record contains no reply or acknowledgment by Alabama officials, and no indication that formal extradition proceedings were ever initiated. Therefore, in light of *Bobo*, I find the State failed to demonstrate due diligence. Thus, Defendant's assignment of error on this issue has merit, and I would reverse Defendant's conviction and vacate his sentence.