MAX N. TOBIAS, JR., Judge.
_JjThe defendant, Edward Augustine, appeals his convictions and sentences for second degree murder (a violation of La. R.S. 14:30.1) of Aaron Williams, and attempted second degree murder (a violation of La R.S. 14:(27) 30.1) of Kimberly Williams for which he received, respectively, a life sentence at hard labor without the benefits of parole, probation, or suspension of sentence and 30 years at “hard labor.” Both sentences are to be served concurrently, with credit for time served. For the reasons that follow, we affirm.
I.
The state filed a bill of information on 24 March 2011 charging Edward Augustine (“Edward”) with one count of second degree murder and one count of attempted second degree murder. On 4 April 2011, he appeared with counsel and entered pleas of not guilty. On 2 March 2012, the trial court denied his motions to suppress evidence and identification, and on 24 April 2012, denied Edward’s motion for the state to turn over the unredacted statements of three witnesses. From that latter denial, he sought supervisory review from this court, which was refused. State v. Augustine, 12-0638, unpub. (La.App. 4 Cir. 6/1/12). Trial commenced on 26 November 2012 and ended on 28 November 2012 with the jury | returning guilty verdicts on both *151 counts. Edward filed a motion for new trial that was denied by the trial court. He was then sentenced as noted above.
II.

Testimony of Merlin Williams

Merlin Williams testified at trial that he was the father of the decedent, Aaron Williams (“Aaron”). He testified that on 8 December 2007, he was living with his wife and Aaron at 4300 Sullen Place in New Orleans. He stated that he was in his car when he received a phone call from his wife who told him that Aaron had been shot. Mr. Williams returned home, picked up his wife, and together went to Tullís Drive where he observed his son lying on the ground bleeding. He testified that some people who were on the scene told him who had shot his son. Mr. Williams also stated that he knew his son was friends with Terrance Augustine (“Terrance”), the brother of the defendant.

Testimony of Yolanda Haynes

Yolanda Haynes testified that she was a 911 operator for approximately three and a one-half years and worked in the communications department of the New Orleans Police Department (“NOPD”), answering 911 calls and writing “incident recalls.” She testified as to the authenticity of the 911 reports made on the day of the crime.

Testimony of Charlene Smith

Charlene Smith testified that on 8 December 2007, she was returning home from work when she saw the decedent fighting with another boy. She stated that she went into her home, an upstairs apartment, looked out of the window, and witnessed a boy holding Aaron while Aaron fought with another boy. She testified that she yelled out of her window and instructed the other boy to let go of Aaron, | abut to no avail. Ms. Smith identified a photograph of an individual that she referred to as “T” (later identified as Terrance) as the person with whom Aaron was fighting. She explained that she went downstairs, brought Aaron upstairs to her apartment, and cleaned a cut on his chin. When Aaron left, she called 911 because Aaron was alone. She stated that shortly thereafter she heard gunshots. She testified that she knew Aaron and “T” from their hanging out in her area with the other boys who frequently hung out together. She stated that “T” and Aaron were friends.

Testimony of Sergeant Andre LeBlanc

Sergeant Andre LeBlanc[1] testified that he was with the NOPD for thirteen years and that on 8 December 2007, he was assigned to the NOPD’s Fourth District Investigative Unit in the Property Crimes Division located in Algiers. He stated that on that day, he responded to a dispatch call of multiple gunshots in the 5900 block of Tullís Drive. When he arrived with his partner, Detective Kevin Bell, he observed that the scene had been secured by other officers. A man who had been shot several times was lying on the ground. He testified that EMS had already pronounced the man dead. Sergeant Le-Blanc, as lead investigator on the scene, stated that he immediately started talking to the people who were standing around. He was able to speak to a lady who was willing to cooperate with him, so he transported her to the police station. In addition to that witness, he testified that Terrance and James Green were also taken in for questioning. The sergeant testified that he learned that Terrance had been in a fight and that it was physically apparent from his appearance. He stated his investigation revealed that the victim |4had been in a fight shortly before his death and that *152 one of the individuals involved in the fight was Terrance. He stated that the only-possible suspect he knew of from an anonymous witness went by the name of “D-Murder” and that “D-Murder” was Terrance’s brother, whose real name was Damian Red. However, through investigation and talking to witnesses, including Terrance and James Green, Sergeant LeBlanc stated that he was able to positively determine that Edward was the shooter. The sergeant testified that Edward was apprehended in Colorado months after the shooting.

Testimony of Detective Kevin Bell

Detective Kevin Bell testified that he partnered with Sergeant, then detective, LeBlanc and corroborated Sergeant Le-Blanc’s account of the events.

Testimony of Don Hancock

Don Hancock, a telecommunications telephone supervisor for the Orleans Parish Sheriffs Office, testified that he receives requests from different agencies to turn over recorded inmate phone calls and that, in the instant case, the District Attorney’s Office asked him to turn over the phone records of Edward in the form of a CD. He stated that the CD contained inmate-identifying information (specifically a PIN[2] number) and that the CD offered into evidence at trial matched Edward’s phone calls made from prison. Mr. Hancock testified that he listened to the calls and that he was able to verify that it was Edward making them.
Several transcribed phone calls made by Edward appear of record: On 9 April 2008, he and the person on the phone talked about “them” watching and that they were going to tell “them” that he, Edward, was out of town. On 22 April | ,2008, Edward told the person to whom he spoke that he would most likely be out of jail in sixty days if no witnesses came forward. Talking to his brother, Damian Red, Edward inquired as to whether his brother had spoken to a girl he chose not to name, inferring that he was inquiring about whether the girl was going to reveal information about the shooting. Lastly, on 11 May 2008, in a conversation with his brother Terrance, he indicated that there were “girls” who were willing to sign a paper to indicate that he was not involved.

Testimony of Tariyon Rose

Tariyon Rose, who initially testified on day two of trial, stated that she and Aaron were friends and that they attended school together. She stated that on 8 December 2007, she lived at 5981 Tullís Drive and that Aaron had spent the night with her the preceding two days. She stated that on that day she went to take a shower while Aaron went outside. As she was getting dressed, she heard banging on the door. She stated that when she opened the door, Aaron was standing there with an injured chin, and he told her that he had been in a fight with two “dudes” because he did not want to share his potato chips. Ms. Rose testified that she and Aaron walked outside so that Aaron could show her with whom he had fought. According to Ms. Rose, Aaron pointed out “Terrance and a boy James.” She explained that she proceeded to walk to the store after Aaron pointed out the two people he had fought with, and Edward walked past her dressed entirely in black with a gun at his side. She said she recognized Edward because she had previously seen him pick up his brother, Terrance, in a car. Ms. Rose testified that upon recognizing Edward she was barely able to turn around when she heard gunshots. She stated that she saw Terrance and Edward running back towards the *153 store. She | ^stated that Kimberly Williams (“Kimberly”) had been hit by a bullet and that she was walking with the assistance of two other girls.

Testimony of Officer Robert Dees

Officer Robert Dees testified that he was lying in his bed after work on 8 December 2007 when he thought he heard gunshots. After observing from his window vehicles stopped on Tullís Drive, he grabbed his police radio and duty weapon, exited his house, and observed people running from the side of “Julien’s,” the corner store. Officer Dees stated that he called NOPD dispatch and gave descriptions of the vehicles and the people he saw running. Although he was able to identify one vehicle, he was unable to give a description of the individuals he witnessed running, save that they were African-American.

Testimony of Wanda Nicholls

Wanda Nicholls of Moon’s Towing testified that she tows and sells cars and that the vehicle identified by Officer Dees was sold on 4 December 2007 to Edward.

Testimony of Detective Glenn Washington

Detective Glenn Washington testified that he was assigned to the NOPD Fourth District Task Force on 8 December 2007. He and his partner, Detective Wesley Humbles, responded to a homicide on Tul-lís Drive. He stated that he assisted in preserving the crime scene. He testified that he recognized the reference to “T” as being Terrance, and that he later learned that Terrance and James Green were involved in a fight with Aaron. Detective Washington explained that his investigation led him to the home of Freddie Red, Terrance’s grandmother, where he, Detective Humbles, and Sergeant Laurent arrested Terrance and James Green.

_J¿Testimony of Detective Anthony Pardo

Detective Anthony Pardo testified that he had been a member of the NOPD for approximately fourteen years and worked for the homicide division for ten of those years. He testified that on 8 December 2007, he learned of a surviving gunshot victim at a shooting on Tullís Drive who had been transported to Tulane Hospital. He went to Tulane Hospital and interviewed Kimberly. He learned that she was sitting outside in the 5900 block of Tullis Drive when she witnessed an altercation between a person she described as “Red” and who Detective Pardo described as the “perpetrator.” Kimberly gave a description of the “perpetrator” and the “perpetrator’s little brother” and told Detective Pardo that she was shot along with Aaron. Detective Pardo testified that he turned in all of his investigation material to Detective LeBlanc once he returned to the station.
III.

ERRORS PATENT

A review of the record reveals one error patent. On Count One, the violation of La. R.S. 14:80.1, second degree murder, Edward was sentenced to life imprisonment at hard labor without benefits. As to Count Two, the violation of La. R.S. 14: (27)80.1, attempted second degree murder, the district court sentenced Edward to thirty years at hard labor but failed to include that the sentence was without the benefits of parole, probation, or suspension of sentence. The district court stated:
So as to count two the jury has found you guilty of attempted second-degree murder, the Court is gonna [sic] impose a sentence of 30 years in the Department of Corrections at hard labor.
La. R.S. 14:(27)30.1 D(l)(a) mandates that the sentence be served without bene *154 fit of parole, probation, or suspension of sentence. Per State v. Williams, 00 — p.725s (La.11/28/01), 800 So.2d 790, 805, the self-enacting provision of La.Rev.Stat. 15:801.1 A is deemed as part of the sentence to be served without benefit or probation, parole, or suspension of sentence.
This error corrects itself by operation of law.
IV.

ASSIGNMENT OF ERROR NUMBER 1

Edward asserts in his first assignment of error that the state violated its duty under Brady v. Maryland, 378 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it failed to provide him with Tariyon Rose’s prior statement to then Detective LeBlanc. He argues that the district court erred in not requiring the state to provide the recorded statement of Ms. Rose’s interview by Detective LeBlanc prior to the state resting its case.
According to Edward, Ms. Rose was the only person who testified as to his identity. He argues that a direct contradiction exists between the recorded statement Ms. Rose gave to Detective LeBlanc on the night of the murder and her testimony at trial. Specifically, Edward maintains that the recorded statement indicates that she did not see the shooter before the shooting, hearing only gunshots, but at trial she testified that she saw Edward walk past her with a gun.
Edward maintains that the state violated Brady wherein the Court found that suppression of a confession by a confederate of the defendant was a violation of due process under the Fourteenth Amendment. In support of his argument, he maintains that at least twice during trial he requested that the state provide him with Brady material and that if he would have been privy to Ms. Rose’s statement, it might have affected the outcome and/or provided a basis for impeachment. He relies on Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), wherein the Court reversed and remanded Kyles’ conviction and sentence for first degree murder after Kyles [ ¡/earned that the state withheld an eyewitness statement, numerous statements by an informant, and a computer printout of cars and license plates. The Court noted that Kyles’ car was not at the scene, and, citing United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), concluded that “had the evidence been disclosed to the defense, the result of the proceeding would have been different.” Kyles, 514 U.S. at 433-434, 115 S.Ct. 1555.
Further, Edward argues that he was not allowed to read from Ms. Rose’s prior statement in an effort to impeach her and that the district court only allowed him three minutes to call a witness to impeach Ms. Rose, but he was unable to produce the witness in the time allowed. Additionally, he maintains that the state knew of Ms. Rose’s statement a week prior to trial, that the record supports this contention, and that since his Sixth Amendment right to confrontation was violated, he is entitled to a new trial.
Contrariwise, the state maintains that Edward’s scenario is exactly the scenario in State v. Smith, 430 So.2d 31, 42 (La.1983), wherein the Court stated:
The case at bar, however, is distinguishable from Brady, for we do not have a situation where withheld information was discovered only after conviction, but one where the exculpatory evidence became available to the defense during trial. See United States v. Kaplan, 554 F.2d 577 (3rd Cir.1977). Not all cases involving late disclosure of exculpatory evidence re- *155 suit in reversible error. We must determine whether the late disclosure so prejudiced the defendant that he was denied his constitutional right to a fair trial. State v. Arnaud, 412 So.2d 1013 (La.1982); State v. Roussel, 381 So.2d 796 (La.1980); State v. Manning, 380 So.2d 46 (La.1980).
The state further argues that it provided Edward with a redacted copy of the full investigation report that included a “synopsis” of Ms. Rose’s statement to Detective LeBlanc. According to the state, it had no duty to provide Edward with a copy of Ms. Rose’s statement until her testimony revealed inconsistencies with | inthe recorded statement. The state argues that it provided Edward with a copy of the statement at the end of its case and that Edward did not proceed as he could have in order to impeach Ms. Rose. The state further maintains that prior to Edward resting his case he could have called Ms. Rose or Sergeant LeBlanc to the stand. Finally, the state argues that Edward erred in waiting to reference Ms. Rose’s statement during closing arguments instead of at an earlier point during trial.
The state contends that more importantly, its star witness was Edward himself. According to the state, the jury heard tapes of Edward stating that he was expecting to be released from jail by inferring that the female witness (Ms. Rose) would likely not cooperate; that he made up a false alibi; and that he would pay someone for a phony affidavit. Therefore, the state argues that even if Edward was able to impeach Ms. Rose, the outcome would be the same because the tapes heard by the jury of Edward’s account of the event far outweigh a statement made by Ms. Rose, who was most likely reluctant to be a witness.
The inquiry here is whether Edward was entitled to this evidence. If he was not, the state was under no obligation to provide it. If this evidence is found to be discoverable, the question then becomes whether the facts and circumstances of the state’s actions or omissions indicate improper intent on their part.
We first look to a timeline of what happened and when it happened in the trial. The record before us reveals the following:
At trial, the state called Sergeant Le-Blanc on day two of trial before calling Ms. Rose as a witness. During the redirect examination of Sergeant LeBlanc, the state moved to introduce in evidence “for record purposes only” a transcription of the statement Sergeant LeBlanc took from Ms. Rose. Without requesting to see the | ^statement or ever having reviewed it, Edward’s counsel objected to its admission on the grounds that the statement was hearsay. The trial court sustained the objection. Edward’s counsel then proceeded to re-cross examine Sergeant Le-Blanc. Though he was then aware of the statement Ms. Rose gave to Sergeant Le-Blanc and the statement was available to him, Edward’s counsel did not use the statement in his re-cross examination of Sergeant LeBlanc.
On day three of trial, Sergeant LeBlanc was recalled by the state to again testify. On direct examination, he stated that on the day of the shooting, Terrance wore a dreadlocked hairstyle. On cross-examination, Edward’s counsel questioned him at length concerning “things that Tariyon Rose told [him],” and regarding his written summary of what she told him as related in the police report he prepared of the incident. Though available prior to his cross-examination of Sergeant LeBlanc, the record does not reflect that Edward’s counsel at trial either requested a copy of the transcript of Ms. Rose’s recorded statement that the state had sought to admit into evidence the previous day, or *156 that Edward’s counsel reviewed the transcript of her statement at the time of his first cross-examination of Sergeant Le-Blanc on the second day of trial.
The state initially called Ms. Rose to testify on day two of trial. Her testimony followed that of Sergeant LeBlane and occurred subsequent to the state’s attempt to enter in evidence a transcript of the recorded statement she gave to Sergeant LeBlane. Though available to him, Edward’s counsel did not refer to her prior statement in his cross-examination of Ms. Rose at trial on day two.[3]
Ms. Rose was recalled by the state to testify on day three of trial. On direct examination, she stated that, as she walked to the store, Edward passed her, | j 2moving in the opposite direction towards the scene where the fight occurred. He was wearing a black long-sleeved shirt and black pants. At that time, he had a gun at his side in the waistband area. She testified that as she heard gunshots, she turned around and saw Edward running from the scene with the gun then in his hand and Terrance running behind him. Ms. Rose testified that she met with Detective LeBlane at the district station and described the person she saw running from the scene with the gun in his hand as “Tee’s brother,” but stated that she didn’t know him. She had seen him once before when he came to pick up Terrance from her house.
Edward’s counsel then cross-examined Ms. Rose. Again, though available to him since the previous day, the record does not reflect that Edward’s counsel requested a copy of the transcript of Ms. Rose’s recorded statement or that he reviewed it prior to his cross-examination of her on day three of trial.
This court has set forth the Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), review as follows:
Due process requires the disclosure of evidence that is both favorable to the accused and material either to guilt or punishment. Brady v. Maryland, 373 U.S. at 87, 83 S.Ct. at 1197-97. The Brady rule also requires the disclosure of evidence adversely affecting the credibility of government witnesses. See Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). When such information is not disclosed and it is material in that its suppression undermines the confidence in the outcome of the trial, then constitutional error occurs and the conviction must be reversed. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Id. Materiality hinges on “not whether the defendant would more likely than not have received a 11sdifferent verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.” Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). Further, the defendant must show that “ ‘disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable.’ ” State v. Marshall, 81-3115, 94-0461 (La.9/5/95), 660 So.2d 819, 826 (quoting Kyles, 514 U.S. at 441, 115 S.Ct. at 1569).
State v. Hollins, 11-1435, p. 23 (La.App. 4 Cir. 8/29/13), 123 So.3d 840, 858.
As previously noted, the record reflects that the state sought to introduce *157 Ms. Rose’s statement on day two of trial during its re-direct examination of Sergeant LeBlanc, to which Edward objected on the grounds of hearsay. The trial testimony on day two of trial at the close of the state’s re-direct examination of Sergeant LeBlanc was as follows:
MS. BERTHELOT:
Your Honor, the State would also move to introduce Tariyon’s statement, as it was gone into extensively by the Defense.
MR. GREEN:
Your Honor, obviously we would object. It’s hearsay. It wasn’t gone into by the Defense because we’ve never seen it.
THE COURT:
Sustained. I am sorry, what is this person’s name? Say it again for the record, please.
MS. BERTHELOT:
Tariyon Rose.
THE COURT:
Spell Tariyon.
MS. BERTHELOT:
|14T-A-R-I-Y-Q-N.
THE COURT:
And what’s the last name?
MS. BERTHELOT:
Rose.
THE COURT:
Any questions for Detective Leblanc [sic]?
MS. BERTHELOT:
Thank you, Sergeant, no further questions.
MR. GREEN:
Your Honor, may I just have one or two questions on re-cross?
THE COURT:
Will it prevent you from having to recall Detective LeBlanc in the Defense’s case?
MR. GREEN:
Yes, Your Honor.
It does not appear from the record that Edward requested a copy of the statement or reviewed it prior to lodging his hearsay objection, which the court sustained. Ms. Rose first testified on day two of trial after the state moved to introduce her statement into evidence. Thus, according to the record, Edward had access to Ms. Rose’s statement for review and impeachment purposes prior to his initial cross-examination of her on day two of trial, as well as prior to his re-cross examination of her on day three of trial. Moreover, the record confirms that the statement was also available to Edward’s counsel prior to his re-cross examination of Sergeant Le-Blanc on day three of trial. That Edward did not request a copy of Ms. Rose’s 1^statement from the state until day three of trial following the testimony of these two witnesses does not mean that it was not available to him for cross-examination or impeachment purposes as he claims, for the record clearly indicates that it was. On the last day of trial, the court instructed the state to submit the statement to Edward, but also instructed that he was required to follow the rules of impeachment. Because the statement was available to Edward prior to his re-cross examination of Sergeant LeBlanc and prior to both his initial and his re-cross examination of Ms. Rose, we do not find that the state withheld evidence or that a Brady violation has occurred.
Even if we were to conclude that the statement had not been properly turned over by the state to Edward, “[t]he information allegedly withheld by the State must be ‘material’ to the defendant’s guilt or innocence to constitute Brady evi *158 dence. That is, there must be a reasonable probability that, had the evidence been disclosed, there would be a difference in the outcome.” State v. Hawkins, 90-1285, p. 6 (La.App. 4 Cir. 9/15/95), 667 So.2d 1070, 1076. Here, we find that Ms. Rose’s statement to Detective LeBlanc was not so material that Edward or his counsel having it in advance of trial would have changed the outcome of the case.
The record contains Ms. Rose’s statement to Detective LeBlanc. Ms. Rose states that she clearly saw the gunman, was able to describe him, and indicated that she could identify the gunman if a picture was shown to her. Edward fails to point to major inconsistencies or exculpatory evidence in Ms. Rose’s statement. Further, in both her statement and her testimony, she stated that she did see the gunman. Therefore, Edward does not demonstrate that he was deprived of any exculpatory material under Brady. It is likely that the district court found that the statement was cumulative of the testimony elicited at trial. As such, even had he reviewed it 11fiwhen it became available, the statement does not contain any additional information that would have aided Edward’s cross-examination of Detective Le-Blanc or Ms. Rose. Edward has not shown how having Ms. Rose’s statement prior to trial would have affected the outcome of the trial. Neither was the defense prejudiced by the failure of the state to disclose the statements prior to trial.
Furthermore, the statement was eventually given to Edward after he objected to its admission initially and he failed to use it to impeach Ms. Rose or Detective Le-Blanc.
We find no Brady violation by the state. Further, the failure of Edward or his counsel to review the transcript of Ms. Rose’s statement when it was first offered as evidence by the state following Sergeant LeBlanc’s initial appearance as a witness falls within the ambit of trial strategy. The trial court did not err in refusing to grant a mistrial regarding the statement. The assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER 2

In his second assignment of error, Edward asserts that the trial court erred by repeatedly allowing hearsay testimony.
According to Edward, the district court allowed an abundance of hearsay testimony. Specifically, he maintains that Detective Pardo, who interviewed Kimberly in the hospital on the day of the incident, was allowed to testify as to what he learned from her. Detective Pardo testified that Kimberly saw Aaron in an altercation, and that she was able to describe the shooter and distinguish the shooter from the shooter’s brother. According to Edward, he was convicted on the attempted murder charge of Kimberly by Detective Pardo’s hearsay testimony.
|17A1so, Edward maintains that Detective LeBlanc was also allowed to testify as to what he learned. The detective testified that he learned that Terrance was involved in an altercation and that the possible shooter was referred to as D-Murder, whose name was Damian Red. Further, Edward maintains that only through the inadmissible hearsay of Ms. Rose was it revealed that “Kenny” (Ms. Rose’s brother) allegedly told her that Edward’s family offered her money not to testify.
Edward argues that he objected to the hearsay testimony numerous times throughout the trial and that the district court allowed witnesses to rephrase their responses from what they were “told” by an individual to what they “learned” from an individual.
*159 Edward relies on State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801, wherein the defendant, who was found guilty of first degree murder and sentenced to death, argued on appeal that the hearsay testimony of the officers as to the two eyewitnesses who identified the defendant should not have been admissible. The Court reasoned, and Edward cites:
Information about the course of a police investigation is not relevant to any essential elements of the charged crime, but such information may be useful to the prosecutor in “drawing the full picture” for the jury. However, the fact that an officer acted on information obtained during the investigation may not be used as an indirect method of bringing before the jury the substance of the out-of-court assertions of the defendant’s guilt that would otherwise be barred by the hearsay rule. State v. Wille, 559 So.2d 1321, 1331 (La.1990); State v. Hearold, 603 So.2d 731, 737 (La.1992). As this Court emphasized in Hearold, 603 So.2d at 737,
Absent some unique circumstances in which the explanation of purpose is probative evidence of a contested fact, such hearsay evidence should not be admitted 11Runder an “explanation” exception. The probative value of the mere fact that an out-of-court declaration was made is generally outweighed greatly by the likelihood that the jury will consider the statement for the truth of the matter asserted.
Id., pp. 8-9, 753 So.2d at 809.
Thus, Edward maintains that the hearsay evidence was not harmless error because it is possible that the jury relied on the evidence to determine that he murdered Aaron and attempted to murder Kimberly, and because of that, he was not afforded a fair trial.
The state contends, however, that the evidence presented at trial was “merely cumulative, corroborative, or exculpatory” to other evidence adduced. It maintains that Detective Pardo testified that Kimberly identified someone other than Edward as the shooter, and therefore, there was no way the evidence could have been prejudicial. Further, the state contends that Detective LeBlanc’s testimony was merely a corroboration of the testimony of Charlene Smith, Tariyon Rose, and Dale Smith. Finally, the state maintains that Ms. Rose’s testimony about being offered compensation by her brother, Kenny, is corroborative to what the jury heard on the taped discussions of Edward wanting to discourage witnesses from testifying.
The statements made by Detective Pardo, Detective LeBlanc, and Ms. Rose are hearsay. La. C.E. art. 801. Therefore, the issue is whether admitting the hearsay testimony was harmless. La. C.Cr.P. art. 921.
La. C.E. art. 801 A(l) and C define hearsay as an oral or written assertion, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. Hearsay evidence is |1flnot admissible except as otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802.
The Sixth Amendment’s confrontation clause provides that, “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” U.S. Const. Amend. VI. In Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Court found that certain ex parte examinations, while admissible under modern hearsay rules, are exactly the kind of testimonial evidence against the accused that the confrontation clause is supposed to prevent: that is, testimonial evidence in the *160 form of an out-of-court declaration to establish or prove a fact. The Court found that under the Sixth Amendment a necessary condition for the admissibility of the testimonial statements against an accused in a criminal case is the prior opportunity to confront the unavailable witness.
Nonetheless, in light of Crawford) both Detective Pardo’s and Detective LeBlanc’s statements were testimonial. “Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard.” Crawford, 541 U.S. at 52,124 S.Ct. 1354.
“If hearsay evidence has been improperly admitted, the trial court’s error is subject to a harmless error standard of review. The error is harmless when the appellate court finds that, in light of the evidence proving the defendant’s guilt, the verdict rendered was surely unattributable to the error.” State v. Smith, 11-0091, pp. 18-19 (La.App. 4 Cir. 7/11/12), 96 So.3d 678, 690 (citing State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832, 845).
The record demonstrates that Detective Pardo testified as to his own observations during his investigation. The testimony was offered in an attempt to explain the course of the investigation leading to the arrest of Edward. Edward |20was given the opportunity to cross-examine Detective Pardo regarding his observations, and he could have highlighted any weaknesses in Detective Pardo’s testimony. “Information about the course of a police investigation is not relevant to any essential elements of the charged crime, but such information may be useful to the prosecutor in drawing the full picture’ for the jury.” Broadway, 96-2659, p. 8, 753 So.2d at 809. In Broadway, the Court affirmed the defendant’s conviction and sentence after a police officer’s testimony of the statements that a “co-participant” aided in the defendant’s murder conviction. The Court concluded that the reference to the “co-participant’s” statements was harmless error. Id., pp. 23-25, 753 So.2d at 817-818.
Although Detective Pardo’s testimony violated the standards set out in Crawford, the violation was harmless in the context of this case. Kimberly was shot at the same time as Aaron. Ms. Rose identified Edward as the shooter and Ms. Williams identified Damian Red as the shooter. Edward was not prejudiced by these statements. Kimberly did not take the stand at trial; thus, Detective Pardo offered testimony as to what he learned about Kimberly during his investigation of the murder. “In certain circumstances, the testimony of a police officer may encompass information provided by another individual without constituting hearsay if offered to explain the course of the police investigation and the steps leading to the defendant’s arrest.” State v. Cyrus, 11-1175, pp. 20-21 (La.App. 4 Cir. 7/5/12), 97 So.3d 554, 565-566, citing State v. Smith, 400 So.2d 587, 591 (La.1981). We find Detective LeBlanc’s testimony was harmless because it was cumulative to testimony from other witnesses. “[T]he introduction of statements complained of as hearsay which are merely corroborative and cumulative of other testimony presented by the state is harmless error.” State v. Hawkins, 90-1235, p. 14 (La.App. 4 Cir. 9/15/95), 667 So.2d 1070, 1080 (citing State v. Hall, 624 So.2d 927, 930 (La.App. 2d Cir.1993) and State v. Franklin, 520 So.2d 1047, 1053 (La.App. 3rd Cir.1987)).
As to Edward’s argument concerning Ms. Rose’s statement that she was told she would receive money in lieu of testifying, we do not find a violation of Crawford; the statement was not testimonial in a manner that would violate Crawford. In addition, it does not fit within a *161 hearsay exception. However, the hearsay testimony was harmless. Her statement was cumulative to Edward’s recorded calls submitted into evidence. Therefore, the admission of Ms. Rose’s testimony as to what her brother Kenny said is harmless error.
The assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 3

In his final assignment of error, Edward asserts the trial court erred in not granting a delay in sentencing after his motion for new trial.
Edward contends that he requested a delay in sentencing, which the district court denied. The district court imposed sentences without waiting twenty-four hours after denying his motion for new trial. See La.C.Cr.P. art. 873.
The state maintains that the error is harmless in accordance with this court’s decision in State v. Riley, 05-1311 (La.App. 4 Cir. 9/20/06), 941 So.2d 618, since Edward failed to challenge his sentence in the instant appeal.
La.C.Cr.P. art. 873 states:
If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.
122The record reveals that on 4 January 2013, Edward moved for a new trial that was denied that day. He then requested a delay in sentencing in accordance with La. C.Cr.P. art. 873:
MR. GREEN[4]
Your Honor, we’re gonna [sic] ask for a delay in sentencing.
THE COURT:
What reason?
MR. GREEN:
Article 873, Code of Criminal Procedure.
THE COURT:
I’ve already given you a delay in sentencing. In fact, two delays. Your request is denied.
MR. GREEN:
Thank you. Note our objection.
The failure to observe the twenty-four-hour delay mandated by article 873 is harmless where the defendant does not complain of his sentence on appeal. State v. Duncan, 11-0563, p. 8 (La.App. 4 Cir. 5/2/12), 91 So.3d 504, 511; State v. Green, 10-1355, p. 12 (La.App. 4 Cir. 6/22/11), 69 So.3d 695, 703.
This court has also held that the failure to observe the twenty-four delay provided for by La.C.Cr.P. art. 873 is harmless error when a sufficient delay between the date of conviction and the date of sentencing exists; where there is no indication that the sentence was hurriedly imposed; and when there is no argument | ^or showing of actual prejudice by the failure to observe the delay. State v. Stovall, 07-0343, p. 12 (La.App. 4 Cir. 2/6/08), 977 So.2d 1074,1082; State v. Sam, 99-0300, p. 8 (La.App. 4 Cir. 4/19/00), 761 So.2d 72, 78.
In Sam, the defendant was convicted on 9 August 1995. Thirty days later, the trial court denied the defendant’s motion for new trial and immediately imposed sentence. On an errors patent review, this court noted that there was no indication the defendant’s sentence was hurriedly im *162 posed, and the defendant did not argue or in any way show that he was actually prejudiced by the trial court’s failure to observe the delay. Even though the defendant argued that an excessive sentence was imposed as an assignment of error in Sam, this court found that the failure to observe the delay constituted harmless error.
In the instant case, Edward was convicted on 28 November 2012. His sentencing hearing was on 4 January 2013. We find no indication that his sentence was hurriedly imposed. Neither do we find that the record reflects that Edward argued that he was prejudiced in any way by the trial court’s failure to observe the delay. Accordingly, although in the instant case the trial court erred in failing to observe the twenty-four-hour delay required by La.C.Cr.P. art. 873, the error was harmless. We thus find no merit to the assignment.
V.

CONCLUSION

We affirm the convictions and sentences of Edward Augustine.
AFFIRMED.
BELSOME, J., Concurs in the Result with Reasons.

. At the time of the crime, Sergeant LeBlanc was a NOPD detective.

. Personal Identification Number.

. A summary of Ms. Rose’s testimony given on day two is provided supra.

. Mr. Green was counsel for Edward.