SANDRA CABRINA JENKINS, Judge.
|, After the close of a jury trial, the defendant, Ryan Poree, was convicted of two counts of second degree murder, one count of attempted second degree murder, and one count of obstruction of justice. Counsel for the defendant filed a motion to withdraw and a Benjamin[1] brief with this Court, requesting only a review of the record for errors patent. After conducting our own independent examination of the entire record, we grant counsel’s motion to withdraw and affirm the defendant’s convictions and sentences.
FACTUAL AND PROCEDURAL BACKGROUND
The defendant, Ryan Poree, lived next-door to Kimberly Perry on Woodbine Drive in eastern New Orleans. On October 14, 2011, Kimberly and her brother, Alcee Perry, both died of multiple gunshot wounds; Robert Aguillard, the Perrys’ •nephew, survived a gunshot wound that lacerated his colon and small intestine. Several witnesses identified the defendant as the shooter and the State obtained an indictment charging the defendant with the second degree murders of Kimberly and Alcee, the' attempted second degree murder of Robert, and one count of obstruction of justice. The defendant pled not guilty to all charges. The trial court *374 12subsequently denied the defendant’s motions to suppress the evidence, statement, and identification. Thereafter, the defendant withdrew his not guilty plea and entered a plea of not guilty and not guilty by reason of insanity. The court convened a competency commission,[2] and ultimately found the defendant competent to proceed.
Trial commenced and after five days, the jury found the defendant guilty as charged as to all four counts. Thereafter, the defendant filed a motion for new trial, which the trial court denied. The defendant then waived all delays, and was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on both second degree murder counts, forty-nine years at hard labor on the attempted second degree murder count, and forty years at hard labor on the obstruction of justice count. The defendant filed motions to reconsider sentence and for appeal, which were denied and granted, respectively. Appellate counsel for the defendant then filed a motion to withdraw and a Benjamin[3] brief with this Court.
The testimony and evidence adduced at trial is as follows.

Eyewitness Testimony

Tiffany Samuels, Kimberly’s neighbor and best friend, testified at trial. On the date in question, she and Kimberly were outside talking when the defendant drove up at a great rate of speed and parked in front of Kimberly’s house, narrowly missing several children who were playing in the street. Ms. Samuels testified that Kimberly told her that the defendant was “stupid” by the way he was driving. Ms. Samuels stated that the defendant apparently overheard the comment and that lead |Rto an argument between Kimberly and him, which ended when the defendant’s mother coaxed her son inside. Ms. Samu-els stated that the defendant came back outside within minutes to move his truck in front of his house, and the argument continued. Ms. Samuels testified that the defendant’s father then came to the door and his son followed him inside.
Ms. Samuels testified that they went inside their respective houses, and she did not see Kimberly again until Kimberly dropped their daughters off at her house. She stated that sometime later, her husband came inside to tell her that something happened across the street and that she needed to come outside. She stated that she followed her husband outside, but once he made it across the street, he told her to go back home and to call 911. Ms. Samuels later learned from her husband that Kimberly and Alcee were dead.
Ryan Samuels, Tiffany’s husband, testified that he had just arrived home from work and was outside talking to a neighbor when he heard what sounded like a BB gun firing. Soon after, according to Mr. Samuels, he saw the defendant in front of Kimberly’s door, standing in a firing stance, and holding what appeared to be a rifle. He heard screams and saw the defendant run into an alley between Kimberly and the defendant’s house. Mr. Samuels went inside his house, told his wife that something was happening at Kimberly’s house and then walked across the street, where he found Kimberly and Alcee lying on the ground. Mr. Samuels stated that he positively identified the defendant in a photographic lineup as the shooter.
*375 Christopher Perry, Kimberly and Al-eee’s brother and Robert Aguillard’s stepfather, testified that he, his girlfriend, and Robert were at Kimberly’s house on the day of the shooting. Christopher stated that Kimberly requested that he and Alcee come to the front of the house and while they were on their way, he heard |4shots. Christopher testified that he did not see who was shooting, nor did he see anyone leaving the scene. He testified that he saw Kimberly and Alcee lying on the ground outside and Robert lying wounded in the hallway. Christopher stated that when the shooting ended, he called 911. Christopher gave a statement to the police and identified the defendant in a photographic lineup, indicating that the defendant lived next-door to Kimberly and that he saw the defendant sitting in his truck sometime before the shooting.
Lovelace Jenkins, Kimberly’s son, testified that on the day of the shooting, the defendant sped by him and his friends while they were outside playing football and he witnessed his mother ask the defendant to slow down and watch for children. He testified that while he was playing video games with his cousins later in the day, his mother asked his uncles to come to the front of the house. He followed them and saw his Uncle Alcee walk outside. Lovelace testified that he saw the defendant standing outside in front of the door and that his mother was upset and angry, but neither she, nor anyone in his family, had a gun. He stated that he heard his Uncle Alcee tell the defendant: “You don’t have to do this.” Lovelace stated that the defendant then, shot his uncle and his mother. Lovelace testified that while the defendant was shooting, he brought his younger sister to the bathroom for protection. When he returned to the front of the house, he saw that his cousin, Robert, had been shot.
Kiwan Grant, Alcee Perry’s fiancée, testified that prior to the shooting, she saw the defendant standing on the sidewalk in front of Kimberly’s house while Kimberly was away. Kiwan stated that Kimberly later came home and asked where the gun was, which Kiwan responded that there was no need to get a gun. Kiwan stated that she went to the front door and heard Alcee tell the defendant, “put that damn gun away,” immediately before the defendant began shooting. She testified Lthat she left with her son after the shooting, and returned once the police arrived to show them Alcee’s gun, which was in the same place where it had been before the shooting. Kiwan insisted that during the shooting, the only person she saw with a gun was the defendant. Kiwan viewed a photographic lineup at the police station and identified the defendant’s photograph as that of the shooter.

Law Enforcement Testimony

Detective Robert Baehelder, the lead detective, testified that when the initial officers arrived on the scene, Kimberly and Alcee were found lying at the front door and Robert was found lying in the hallway. Det. Baehelder stated that he spoke with witnesses at the scene while other officers gathered evidence, including several .22 caliber casings, and applied for an arrest warrant for the defendant. The defendant was subsequently arrested and on a search incident to arrest, three magazines for a .22 caliber rifle were confiscated off the person of the defendant. Det. Baehelder then executed a search warrant at the defendant’s home. The following items were retrieved from the defendant’s bedroom: .22 caliber bullets,[4] a box with a *376 rifle stock, and paperwork for a gun in the defendant’s name. Later that evening, a .22 caliber rifle was recovered from' the shed behind an abandoned house adjacent to the defendant’s house.
Det. Bachelder testified that after the shooting, he spoke with Kirby Poree, the defendant’s father, who told him that his son and Kimberly had argued both in the past and on that day. After the defendant was arrested and taken to the Homicide Office, he gave a recorded statement to Det. Bachelder. In the statement, the defendant admitted shooting Alcee and Kimberly, but insisted that he shot them to defend himself because Kimberly had threatened to shoot him and |fihe observed Alcee with a gun earlier. Additionally, the defendant admitted to putting the rifle in the shed after the shooting. Det. Bachelder testified that he also took formal statements from a number of witnesses in the days after the shooting.

Defense Witness Testimony

The defense called the defendant’s father, Kirby, who testified that his son had various learning disabilities and social problems. Kirby testified that his son helped him cut the neighbor’s grass and that he had difficulty maintaining employment. Kirby described Kimberly and the defendant’s relationship as “just neighbors” in the beginning, but stated that relations between them became contentious when she criticized the way that he cut her grass. Kirby detailed an incident from February 2011 where his son shot and killed a burglar who broke into their house. According to Kirby, his son believed that Kimberly’s children knew the burglar. Kirby stated that after this incident, his son became more withdrawn, rarely left the house, and refused to get counseling. He further stated that his son’s truck was broken into at least once, and his son was convinced that Kimberly’s son or her brother’s son was the perpetrator.
Kirby testified that on the day of the shooting, he heard Kimberly and his son arguing, and his wife coaxed their son inside. After they attempted to calm their son down, Kirby took a nap, and when he awoke, he saw police car lights through the blinds. On cross-examination, he stated that while Kimberly and his son often argued, his son had never armed himself before. He stated that after the burglary incident, he hid his son’s rifle for a time, but later told him where it was because his son wanted it for protection.
The defendant’s mother, Clarissa Poree, testified to the mental health problems that her family had, including her own struggles with depression. Clarissa stated that on the day of the shooting, her son and Kimberly got into an |7argument outside and he was very upset as Kimberly had threatened him. Clarissa stated that she forced her son inside “to diffuse the argument,” and approximately three hours later, she observed police car lights through her window. According to Clarissa, she was not aware that her son went back outside and she did not witness the shooting.

Expert Testimony

The defendant’s first expert, Dr. Sarah Deland, qualified as an expert in forensic psychiatry, testified that she examined the defendant about a week after the shooting and suspected that he suffered from some type of mental illness, as he appeared to be paranoid. She recommended that he undergo further evaluation and psychological testing, and did not believe that he was malingering.
The defendant’s second expert, Dr. Jill Hayes, qualified as an expert in clinical, forensic, and neuro-psychology, testified that she and another member of her prac *377 tice examined the defendant numerous times. Dr. Hayes administered various tests to the defendant, reviewed his school and medical records, and analyzed the police reports concerning the 2011 burglary and the instant shooting. She opined that on the day of the shooting, the defendant suffered from a delusional disorder, perse-cutory type, which is a mental disease or defect that rendered him incapable from distinguishing right from wrong when he shot the victims. Dr. Hayes testified that people with this disorder hold on to some sort of false belief to the exclusion of any proof otherwise, but can typically conduct day-to-day functions without problems and can go undiagnosed for a long time. She also testified that the defendant had some features of schizoid, schizotypal, and paranoid personalities, but did not diagnose him with a personality disorder per se. Dr. Hayes stated that she found no evidence that the defendant was malingering.
lsDr. Hayes opined that Kimberly’s threatening comments to the defendant on the day of the shooting made him fearful for his life as he believed that Kimberly’s relatives were at her house to kill him. Dr. Hayes further opined that the defendant fled after the shooting because . he wanted to avoid speaking to the police, not because he felt that he had done something wrong, and that he hid the rifle because “he knew he shouldn’t be walking around with a gun in his hand [bejcause it was a really big gun.”[5] Dr. Hayes averred' that on the day of the shooting, the defendant was unable to accurately perceive the amount of threat that Alcee and Kimberly actually posed, and was thus unable to distinguish right from wrong when he shot them.
The State called Dr. Rafael Salcedo, qualified as an expert in forensic psychology, and Dr. Richard Richoux, qualified as an expert in forensic psychiatry, to testify. The doctors examined the defendant twice to determine his competency to stand trial, and a third time to determine his sanity at the time of the offense. Both doctors testified that they found the defendant competent to proceed and that at the time of the shooting, he did not suffer from any mental disease or defect that rendered him incapable from distinguishing right from wrong. The doctors stated that the defendant’s departure from the scene and concealment of the gun prove his knowledge of wrongfulness. The defendant was able to give a detailed account of the events leading up to the shooting, which, according to the doctors, did not reflect a break with reality and did not show that he was delusional. They both further attested that they found no signs that the defendant had a major psychiatric illness.
| ;,Dr. Michael Blue, qualified as an expert in general and forensic psychiatry, was the State’s final witness. Before Dr. Blue examined the defendant, he analyzed the police reports from the 2011 burglary and the instant shooting, and reviewed the other doctors’ reports. Dr. Blue testified at great length concerning his examination of the defendant, which was recorded on the defense attorney’s cellphone. Dr. Blue noted the defendant’s remorse in shooting Robert, which Dr. Blue stated is evidence of the defendant’s consciousness of guilt. Dr. Blue accepted the defendant’s statements — that he thought the victims were armed and that they threw punches at him — as an attempt at establishing a self-defense claim. Dr. Blue discounted the defendant’s fear of Kimberly as delusional, *378 noting that Kimberly had in fact threatened him. Thus, Dr. Blue opined that based on his examination of the defendant, the reasons he gave for shooting Kimberly and Alcee, his flight after the shooting, and his concealment of the rifle, the defendant did not have a mental disease or defect that rendered him incapable from distinguishing right from wrong at the time of the shooting.[6]
LAW AND ANALYSIS
Appellate counsel complied with the procedures outlined by Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), as interpreted by this Court in State v. Benjamin, 573 So.2d 528 (La.App. 4th Cir.1990), and filed the defendant’s brief pursuant to State v. Jyles, 96-2669 (La.12/12/97), 704 So.2d 241. This Court, in State v. Gayton, 13-1613 (La.App. 4 Cir. 1/28/15), 158 So.3d 955, discussed the substance of a Benjamin brief, which requires:
[A] thorough review of the procedural history of the case, a review of the facts of the case, a reference to anything in the record that might arguably support the 110appeal or a statement negating the presence of such, and a statement, either in the motion to withdraw or the appellant’s brief, that counsel, after a conscientious and thorough review of the trial court record, can find no non-frivolous issues to raise on appeal and no ruling of the trial court which arguably supports the appeal.
Id., 13-1613, p. 8, 158 So.3d at 962 (quoting Benjamin, 573 So.2d at 530).
In addition to reviewing counsel’s brief, we have our own independent, non-delegable duty to examine the record in order to determine if any legitimate basis for the appeal exists, which involves:
(1) a review of the bill of information or indictment to insure the defendant was properly charged; (2) a review of all minute entries to insure the defendant was present at all crucial stages of the proceedings, the jury composition and verdict were correct and the sentence is legal; (3) a review of all pleadings in the record; (4) a review of the jury sheets; and (5) a review of all transcripts to determine if any ruling provides an arguable basis for appeal.
Benjamin, 573 So.2d at 530; see also Gayton, 13-1613, pp. 9-11, 19, 158 So.3d at 963-64, 968.
Having set forth the procedures adopted by this Court, we now turn to the case at bar. Counsel’s brief provides a detailed review of the procedural history, the facts of the case, and requests only a review for errors patent. Counsel has moved to withdraw because she believes, after a careful and comprehensive review of the record, that there are no non-frivolous arguments that support an appeal. Counsel sent the defendant a copy of the brief, the motion to withdraw, and two letters — one confidential, which detailed the specific issues considered and why those issues were not briefed; and one non-confidential, which explained the meaning of the brief and informed appellant of his rights related to this matter, including filing a brief in his own behalf. In response to his request, a copy of the record was sent to the defendant and additional time for filing his pro se brief was Ingranted. Despite being offered notice and opportunity, the defendant did not file a pro se brief.
*379 Pursuant to Benjamin, this Court performed an independent and thorough review of the pleadings, minute entries, indictments, and transcripts contained in the appeal record. Our examination revealed that the defendant was properly charged by grand jury indictment, which was signed by the foreperson and entered in open court; the defendant was present and represented by counsel at arraignment, trial, and sentencing; the State proved every essential element of the crimes beyond a reasonable doubt as illustrated by the trial transcript;[7] and the sentences imposed are legal in all respects.[8] Finding no non-frivolous issues or ruling which arguably support an appeal, we affirm the trial court’s judgment and grant appellate counsel’s motion to withdraw.
DECREE
For the reasons set forth herein, the defendant’s convictions and sentences are affirmed; appellate counsel’s motion to withdraw is granted.
MOTION TO WITHDRAW GRANTED; CONVICTIONS AND SENTENCES AFFIRMED.

. See State v. Benjamin, 573 So.2d 528 (La. App. 4th Cir. 1990).

. Although not relevant to the instant opinion, it should be noted that the State sought review of the trial court's ruling, which allowed defense counsel to be present during the examination of Mr. Poree, and this Court denied writs. State v. Poree, unpub. 13-1205 (La.App. 4 Cir. 10/3/13).

. See Benjamin, supra.

. The casings found at the scene and the bullets retrieved from Kimberly and Alcee’s autopsies matched the caliber bullets found in the defendant’s room.

. Dr. Hayes also stated another reason the' defendant hid the rifle is because he did not want another gun taken away as the gun he used to shoot the burglars was already confiscated by the police.

. In addition to the presentation of the foregoing witnesses’ testimony, the State played the 911 tape, and the video of the defendant’s statement to Det. Bachelder on the night of the shooting, his statement made at the time of the burglary, and Dr. Blue’s examination.

. It should be noted that the State presented sufficient evidence for the jury to discount the defendant's defense that he was not sane at the time of the offense.

. While the sentences are legal in all respects, the trial court failed to impose the defendant's attempted second degree murder sentence without the benefit of parole, probation, or suspension of sentence as required by La. R.S. 14:27 and 14:30.1. However, pursuant to La. R.S. 15:301.1(A) and State v. Williams, 00-1725 (La.l 1/28/01), 800 So.2d 790, even when these limitations are inadvertently omitted, they are deemed to have been imposed. See also State v. Augustine, 13-0397 (La.App. 4 Cir. 1/22/14), 133 So.3d 148. Thus, this error, if any, is harmless and this Court need not take any action in this regard.